80 U.S. 72 (____)
13 Wall. 72
JOHNSON
v.
TOWSLEY.
Supreme Court of United States.

*77 Mr. Lyman Trumbull, for the plaintiff in error.
Mr. J.M. Woolworth, contra.
*80 Mr. Justice MILLER delivered the opinion of the court.
The jurisdiction of this court rests on two grounds found in the 25th section of the Judiciary Act, or, perhaps we should rather say, in the 2d section of the act of February 5th, 1867, which seems to be a substitute for the 25th section of the act of 1789, so far as it covers the same ground. The defendant in error relied on his patent, as conclusive of his right to the land, as an authority emanating from the United States, which was decided against him by the State court, *81 and he relied upon certain acts of Congress as making good his title, and the decision of the State courts was against the right and title set up by him under those statutes. Undoubtedly the case is fairly within one or both of these clauses of the act of 1867, and the conclusiveness of the patent and the right of the plaintiffs in error claimed under the statutes must be considered.
The contest arises out of rival claims to the right of pre-emption of the land in controversy. The register and receiver, after hearing these claims, decided in favor of Towsley, the complainant, and allowed him to enter the land, received his money, and gave him a patent certificate. On appeal to the Commissioner of the Land Office their action was affirmed, but on a further appeal to the Secretary of the Interior, the action of these officers was reversed on a construction of an act of Congress, in which the secretary differed from them, and under that decision the patent was issued to Johnson.
It will be seen by this short statement of the case that the rights asserted by complainant, and recognized and established by the Nebraska courts, were the same which were passed upon by the register and receiver, by the commissioner, and by the Secretary of the Interior, and we are met at the threshold of this investigation with the proposition that the action of the latter officer, terminating in the delivery to the defendant of a patent for the land, is conclusive of the rights of the parties not only in the land department, but in the courts and everywhere else.
This proposition is not a new one in this court in this class of cases, but it is maintained that none of the cases heretofore decided extend, in principle, to the one before us; and the question being pressed upon our attention with an earnestness and fulness of argument which it has not perhaps before received, and with reference to statutes not heretofore considered by the court, we deem the occasion an appropriate one to re-examine the whole subject.
The statutory provision referred to is the 10th section of *82 the act of June 12th, 1858,[*] which declares that the 11th section of the general pre-emption law of 1841 shall "be so amended that appeals from the decision of the district officers, in cases of contest between different settlers for the right of pre-emption, shall hereafter be decided by the Commissioner of the General Land Office, whose decision shall be final, unless appeal therefrom be taken to the Secretary of the Interior."
The finality here spoken of applies in terms to the decision of the commissioner, and can only be supposed to attach to that made by the secretary by some process of reasoning, which implies the absurdity of making the decision, on appeal to the secretary, less conclusive than that made by the inferior officer. But the section under consideration is only one of several enactments concerning the relative duties, power, and authority of the executive departments over the subject of the disposition of the public lands, and a brief reference to some of them will, we think, show what was intended by this amendment. By the 1st section of the act to reorganize the General Land Office, approved July 4th, 1836,[] it was enacted that the executive duties now prescribed, or which may hereafter be prescribed, by law, appertaining to the surveying and sale of the public lands,... and the issuing of patents for all grants of land, under the authority of the United States, shall be subject to the supervision and control of the Commissioner of the General Land Office, under the direction of the President of the United States. In the case of Barnard's Heirs v. Ashley's Heirs,[] it was held that this authorized the commissioner to entertain appeals from the decisions of the register and receiver in regard to pre-emption claims, and it is obvious that the direct control of the President was contemplated whenever it might be invoked. Afterward, when the act of September 4th, 1841, was passed, which so enlarged the right of pre-emption as to have been ever since considered the main source of pre-emption rights, the 11th section provided that all questions as to the right of pre-emption arising between *83 different settlers should be settled by the register and receiver of the district within which the land is situated, subject to an appeal to and revision by the Secretary of the Treasury of the United States. This provision, in the class of cases to which it referred, superseded the functions of the Commissioner of the Land Office, as revising officer to the register and receiver, and, so far as the act of 1836 associated the President with the commissioner, superseded his supervisory functions also. It left the right of appeal from the register and receiver to the Secretary of the Treasury direct as the head of the department. The 10th section of the act of 1858, so much relied upon by the plaintiffs in error, the operative language of which we have quoted, was clearly intended to remedy this defect or oversight, and to restore to the commissioner his rightful control over the matters which belonged to his bureau. In the use of the word final we think nothing more was intended than to say that, with the single exception of an appeal to his superior, the Secretary of the Interior, his decision should exclude further inquiry in that department. But we do not see, in the language used in this connection, any intention to give to the final decision of the Department of the Interior, to which the control of the land system of the government had been transferred, any more conclusive effect than what belonged to it without its aid.
But while we find no support to the proposition of the counsel for plaintiffs in error in the special provisions of the statute relied on, it is not to be denied that the argument is much stronger when founded on the general doctrine that when the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties, the decision of that tribunal, within the scope of its authority, is conclusive upon all others. That the action of the land office in issuing a patent for any of the public land, subject to sale by pre-emption or otherwise, is conclusive of the legal title, must be admitted under the principle above stated, and in all courts, and in all forms of judicial proceedings, where this title must control, either by *84 reason of the limited powers of the court, or the essential character of the proceeding, no inquiry can be permitted into the circumstances under which it was obtained. On the other hand there has always existed in the courts of equity the power in certain classes of cases to inquire into and correct mistakes, injustice, and wrong in both judicial and executive action, however solemn the form which the result of that action may assume, when it invades private rights; and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown, or other executive branch of the government, have been corrected or declared void, or other relief granted. No reason is perceived why the action of the land office should constitute an exception to this principle. In dealing with the public domain under the system of laws enacted by Congress for their management and sale, that tribunal decides upon private rights of great value, and very often, from the nature of its functions, this is by a proceeding essentially ex parte, and peculiarly liable to the influence of frauds, false swearing, and mistakes. These are among the most ancient and well-established grounds of the special jurisdiction of courts of equity just referred to, and the necessity and value of that jurisdiction are nowhere better exemplified than in its application to cases arising in the land office. It is very well known that these officers do not confine themselves to determining, before a patent issues, who is entitled to receive it, but they frequently assume the right, long after a patent has issued and the legal title passed out of the United States, to recall or set aside the patent, and issue one to some other party, and if the holder of the first patent refuses to surrender it they issue a second. In such a case as this have the courts no jurisdiction? If they have not, who shall decide the conflicting claims to the land? If the land officers can do this a few weeks or a few months after the first patent has issued, what limit is there to their power over private rights? Such is the case of Stark v. Starrs,[*] in which the *85 patent was issued to one party one day and to the other the day after for the same land. They are also in the habit of issuing patents to different parties for the same land, containing in each instrument thus issued a reservation of the rights of the other party. How are those rights to be determined except by a court of equity? Which patent shall prevail, and what conclusiveness, or inflexible finality, can be attached to a tribunal whose acts are in their nature so inconclusive? So also the register and receiver, to whom the law primarily confides these duties, often hear the application of a party to enter land as a pre-emptor or otherwise, decide in favor of his right, receive his money, and give him a certificate that he is entitled to a patent. Undoubtedly this constitutes a vested right, and it can only be divested according to law. In every such case, where the land office afterwards sets aside this certificate, and grants the land thus sold to another person, it is of the very essence of judicial authority to inquire whether this has been done in violation of law, and, if it has, to give appropriate remedy. And so, if for any other reason recognized by courts of equity, as a ground of interference in such cases, the legal title has passed from the United States to one party, when, in equity and good conscience, and by the laws which Congress has made on the subject, it ought to go to another, "a court of equity will," in the language of this court in the case of Stark v. Starrs, just cited, "convert him into a trustee of the true owner, and compel him to convey the legal title." In numerous cases this has been announced to be the settled doctrine of this court in reference to the action of the land officers.[*]
Not only has it been found necessary in the interest of justice to hold this doctrine in regard to the decisions of the land officers of the United States, but it has been found equally necessary in the States which have had a system of land sales. Numerous cases are found in the courts of Kentucky and Virginia, where they have, by proceedings in equity, established the junior patent to be the title instead *86 of the elder patent, by an inquiry into the priority of location or some other equitable matter, or have compelled the holder of the title under the patent to convey, in whole or in part, to some persons whose claim rested on matters wholly anterior to the issuing of the patent. There is also a similar course of adjudication in the State of Pennsylvania, and we doubt not cases may be found in other States. Several of the Kentucky cases have come to this court, where the principle has been uniformly upheld.[*]
It is said, however, that the present case does not come within any of the adjudicated cases on this subject; that in all of them there has been some element of fraud or mistake on which the cases rested.
Undoubtedly there has been in all of them some special ground for the exercise of the equitable jurisdiction, for this court does not and never has asserted that all the matters passed upon by the land office are open to review in the courts. On the contrary, it is fully conceded that when those officers decide controverted questions of fact, in the absence of fraud, or impositions, or mistake, their decision on those questions is final, except as they may be reversed on appeal in that department. But we are not prepared to concede that when, in the application of the facts as found by them they, by misconstruction of the law, take from a party that to which he has acquired a legal right under the sanction of those laws, the courts are without power to give any relief. And this is precisely what this court decided in the case of Minnesota v. Batchelder,[] and in the case of Silver v. Ladd.[] In this latter case a certificate under the Oregon donation law, given by the register and receiver, was set aside by the commissioner, and his action approved by the secretary, and the action of each of these officers was based on a different construction of the act of Congress. This court held that the register and receiver were right; that *87 the certificate conferred a valid claim to the land, and that the patent issued to another party by reason of this mistake must enure to the benefit of the party who had the prior and better right. This court has at all times been careful to guard itself against an invasion of the functions confided by law to other departments of the government, and in reference to the proceedings before the officers intrusted with the charge of selling the public lands it has frequently and firmly refused to interfere with them in the discharge of their duties, either by mandamus or injunction, so long as the title remained in the United States and the matter was rightfully before those officers for decision. On the other hand, it has constantly asserted the right of the proper courts to inquire, after the title had passed from the government, and the question became one of private right, whether, according to the established rules of equity and the acts of Congress concerning the public lands, the party holding that title should hold absolutely as his own, or as trustee for another. And we are satisfied that the relations thus established between the courts and the land department are not only founded on a just view of the duties and powers of each, but are essential to the ends of justice and to a sound administration of the law.
In the case now under consideration the complainant made his declaratory statement and proved his settlement to the satisfaction of the register and receiver, and they gave him a patent certificate. The defendant, Johnson, contested the complainant's right before these officers and asserted that he was entitled to the pre-emption right for the same land, and when they decided in favor of Towsley he appealed to the commissioner. This officer approved the decision of the register and receiver, and an appeal was taken by Johnson to the Secretary of the Interior. The secretary, or rather the assistant secretary, as appears by the record, rejected Towsley's claim on the sole ground that he had previously filed a declaratory statement of his intention to claim a pre-emption for another tract of land, which he had voluntarily abandoned, and it is clear that but for his construction *88 of the statute on that subject Towsley would have received the patent which was awarded to Johnson.
We must therefore inquire whether the statute, rightly construed, defeated Towsley's otherwise perfect right to the patent, and this inquiry requires consideration of some of the features of our system of land sales.
One of these is that after the surveys are made in any given locality, so that the different tracts can be identified by the descriptions used in these surveys, they are not subject to sale by private entry at the land office until there has been a public auction, at which the lands so surveyed are offered to the highest bidder. The time and place of this sale and the lands offered for sale are made known by a proclamation of the President. The object of this public sale and of withholding the lands from private entry is undoubtedly to secure to the government the benefit of competition in bidding for these parcels of land supposed to be worth more than the price fixed by Congress, at which they may afterward be sold at private entry. But as the tide of emigration was greatly in advance of these public sales, and indeed of the surveys, it was found that settlers who had made meritorious improvements were unable to secure the land on which they had settled without bidding at public auction against parties who took into consideration the value of the improvements so made and who would get them by the purchase. To remedy this evil several of the earlier pre-emption laws were passed, and they only included settlements made prior to the passage of those laws. The act of 1841, however, provided a general system of pre-emption, and authorized pre-emption of lands surveyed, but not open to private entry, as well as land which could be bought at private sale. It protected settlements already made, and allowed future settlements to be made with a right to pre-emption, which was a new feature in the pre-emption system. As, however, these settlements might now be made on lands subject to private sale, and the settler was allowed a year in which to make his entry and pay the money, the 15th section of the act required the settler on such lands to make a *89 declaratory statement if he intended to claim a right of pre-emption, in which he should declare such intention and describe the land. This statement was filed with the register and receiver, and was obviously intended to enable them to reserve the tract from sale for the time allowed the settler to perfect his entry and pay for the land. But an experience of two years seems to have shown that this privilege of withdrawing particular tracts from private sale was subject to abuse by persons who filed declarations for several tracts when they could only receive one as a pre-emptor, thus delaying the sales and preventing others from settling on or buying, with a view to a purchase by themselves or friends when it became convenient to do so. To remedy this evil Congress, when it came to legislate again about the right of pre-emption, by the act of 1843, enacted by the 4th section "that where an individual had filed, under the late pre-emption law, his declaration of intention to claim the benefit of said law for one tract of land, it shall not be lawful for the same individual, at any future time, to file a second declaration for another tract." As the only declaration of intention required by the act of 1841 (which is undoubtedly the one referred to as "the late pre-emption law") was, both by its express terms and by the policy which dictated it, confined to pre-emptions of land subject to private entry, we entertain no doubt that this section was limited, in like manner, to that class of lands. As to lands not subject to private sale no declaration of intention was required by the act of 1841, and the reference to such a declaration in the act of 1843 would be without anything on which to base it. This view is made still clearer by the fact that the next succeeding section of the act of 1843 does introduce distinctly, as a new and separate provision, the requirement that settlers on the land not yet proclaimed for sale are required to make a similar declaration, within three months from the time of settlement, on pain of forfeiting their pre-emption right in favor of the next actual settler, but making no provision whatever for the case of two declarations by the same party on different tracts of land. We are, therefore, of opinion *90 that the effect of a double declaration in defeating the right of the pre-emptor to the tract which he finally claims to purchase is limited to lands subject, at the time, to private sale. The land in controversy in this suit was never subject to private entry, and the application of the principle by the secretary to Towsley's case was, as we think, a misconstruction of the law, through which his right was denied him.
But it is argued that if the pre-emption claim of Towsley was not governed by the 4th section of the act of 1843, it certainly was by the 5th section of that act, and as he did not file his declaration of intention within three months from the time of settlement, his claim was forfeited and gave him no right.
The record shows undoubtedly that his settlement commenced about eight months before he filed his declaration, and it must be conceded that the land was of that class which had not been proclaimed for sale, and his case must be governed by the provision of that section. It declares that where the party fails to make the declaration within the three months his claim is to be forfeited and the tract awarded to the next settler in order of time on the same tract, who shall have given such notice and otherwise complied with the conditions of the law. The words "shall have given such notice," presuppose a case where some one has given such notice before the party who has thus neglected seeks to assert his right. If no other party has made a settlement or has given notice of such intention, then no one has been injured by the delay beyond three months, and if at any time after the three months, while the party is still in possession, he makes his declaration, and this is done before any one else has initiated a right of pre-emption by settlement or declaration, we can see no purpose in forbidding him to make his declaration or in making it void when made. And we think that Congress intended to provide for the protection of the first settler by giving him three months to make his declaration, and for all other settlers by saying if this is not done within three months any one else who has settled on it within that time, or at any *91 time before the first settler makes his declaration, shall have the better right. As Towsley's settlement and possession were continuous, and as his declaration was made before Johnson or any one else asserted claim to the land or made a settlement, we think his right was not barred by that section, under a sound construction of its meaning.
We are of opinion that the decree of the Supreme Court of Nebraska must be
AFFIRMED.
Mr. Justice CLIFFORD, dissenting:
I dissent from the judgment of the court in this case, upon the ground that the case is controlled by the act of Congress which provides that the decision of the Commissioner of the General Land Office shall be final unless an appeal is taken to the Secretary of the Interior. In my judgment the decree of the commissioner is final if no appeal is taken, and in case of appeal that the decision of the appellate tribunal created by the act of Congress is equally final and conclusive, except in cases of fraud or mistake not known at the time of the investigation by the land department.
Mr. Justice DAVIS took no part in the decision of this or the next case, being interested in the question involved.

NOTE.
At the same time with the preceding case was adjudged another from the same court with it, to wit, the case of
NOTES
[*] 11 Stat. at Large, 326.
[] 5 Id. 107.
[] 18 Howard, 45.
[*] 6 Wallace, 402.
[*] Lytle v. Arkansas, 22 Howard, 192; Garland v. Wynn, 20 Id. 8; Lindsey v. Hawes, 2 Black, 559.
[*] Finly v. Williams, 9 Cranch, 164; McArthur v. Browder, 4 Wheaton, 488; Hunt v. Wickliffe, 2 Peters, 201; Green v. Liter, 8 Cranch, 229.
[] 1 Wallace, 109.
[] 7 Id. 219.