## KANSAS PACIFIC RAILWAY COMPANY v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

CERTAIN LAND GRANTS *Construed.* On the 26th of July 1866, the lands adjacent to the then selected line of plaintiff's road up the Smoky Hill river, and including the lands in controversy, were in pursuance of positive and direct legislation reserved from sale by the United States, and on the 22d of January 1867, the road along these lands was completed, accepted by the President, and patents by him ordered to be issued for said lands. The land grants to the defendant provided that, in case it should appear when the line or route of its road was definitely fixed, that the United States had sold any section, or that it had been reserved by the United States for any purpose

whatever, then the Secretary of the Interior should cause other lands in equal amount to be selected for the grant. The line of defendant's road adjacent to the lands in dispute was definitely fixed between the 5th and 20th of September, 1866; *held*, that the grant to the defendant never attached to the said lands, but that the full title thereto passed to the plaintiff by the construction and acceptance of its road.

## *Error from Davis District Court.*

ACTION by the *K. P. Rly. Co.* as plaintiff against the *M. K. & T. Rly. Co.* as defendant, to compel the defendant to execute to the plaintiff a release and conveyance of certain lands to which plaintiff claimed the paramount title, but which had been patented to the defendant by the governor of Kansas on the 15th of January 1873. The district court, at the July Term 1873, found in favor of the defendant, as to the lands in dispute here, and dismissed plaintiff's petition as to such lands. The plaintiff brings the case here. All facts necessary to a proper understanding of the questions decided, are stated in the opinion.

*J. P. Usher,* for plaintiff.

*T. C. Sears,* for defendant.

The opinion of the court was delivered by

BREWER, J.: This is a controversy between these two corporations as to the title to certain lands situated near the junction of their roads, and claimed by each respectively under a congressional land grant. The suit was brought by the plaintiff in error in the district court of Davis county, and embraced nearly one hundred thousand acres of land in the counties of Davis and Dickinson. As to the major portion of these lands the district court decided in favor of the defendant, and the plaintiff now brings the case here on error. Each company claims under a land grant. In neither is it pretended that there was any specific designation of the lands granted. In each, the location of the road determined the specific tracts. It becomes necessary therefore, as to each road, to examine the terms of the grant, as well as to ascer-

tain when the line of the road was definitely fixed. The plaintiff, originally known as the "Leavenworth, Pawnee & Western Railroad Co.," subsequently as the "Union Pacific Railway Co., Eastern Division," and finally by its present name, claims under the acts of congress in aid of the construction of a road from the Missouri river to the Pacific ocean. The first of these acts was approved July 1st 1862, and while it contemplated but a single main line it also provided for the construction of two or three branches on the eastern end. One of these branches was to be constructed by the plaintiff. Sec. 3 defines the land grant to the main company. It reads, "That there be and is hereby granted to the said company * * * every alternate section of public land designated by odd numbers to the amount of five alternate sections per mile on each side of said railroad on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached at the time the line of said road is definitely fixed." Sec. 4 provides that commissioners should be appointed upon the completion of every forty miles of road, to examine and report whether such completed portion was built as required by the act, and upon a favorable report patents were to issue for the adjacent lands. In § 6 the grants were declared to be upon condition that the bonds issued by the United States in aid of the construction should be paid at maturity, that the road should be kept in repair, and the mails, troops, etc., transported thereon. In § 7 the assent of the company to the act was required within one year, and the completion of the road by July 1st 1874; and then follow these provisos:

"*Provided,* That within two years after the passage of this act said company shall designate the general route of said road, as near as may be, and shall file a map of the same in the Department of the Interior, whereupon the Secretary of the Interior shall cause the lands within fifteen miles of said designated route or routes to be withdrawn from preëmption, private entry, and sale; and when any portion of said route

shall be finally located the Secretary of the Interior shall
cause the said lands hereinbefore granted to be surveyed and
set off as fast as may be necessary for the purpose herein
named: *Provided,* That in fixing the point of connection of
the main trunk with the eastern connections, it shall be fixed
at the most practicable point for the construction of the Mis-
souri and Iowa branches, as hereinafter provided."

By § 8 the president was authorized to designate the initial
point of the main line, which was to be on the one-hundredth
meridian west from Greenwich, and at which all the eastern
branches were to unite. Sections 9 and 10 refer to the plain-
tiff's road, and are as follows:

"SEC. 9. *And be it further enacted,* That the Leavenworth,
Pawnee & Western Railroad Company of Kansas are hereby
authorized to construct a railroad and telegraph line from the
Missouri river, at the mouth of the Kansas river, on the
south side thereof, so as to connect with the Pacific Railroad
of Missouri, to the aforesaid point on the one-hundredth me-
ridian of longitude west from Greenwich, as herein provided,
upon the same terms and conditions in all respects as are pro-
vided in this act for the construction of the railroad and tele-
graph line first mentioned, and to meet and connect with the
same at the meridian of longitude aforesaid; and in case the
general route or line of road from the Missouri river to the
Rocky mountains should be so located as to require a depart-
ure northwardly from the proposed line of said Kansas rail-
road before it reaches the meridian of longitude aforesaid, the
location of said Kansas road shall be made so as to conform
thereto; and said railroad through Kansas shall be so located
between the mouth of the Kansas river as aforesaid, and the
aforesaid point on the one-hundredth meridian of longitude,
that the several railroads from Missouri and Iowa, herein
authorized to connect with the same, can make connection
within the limits prescribed in this act, provided the same
can be done without deviating from the general direction of
the whole line to the Pacific coast. The route in Kansas,
west of the meridian of Fort Riley, to the aforesaid point on
the one-hundredth meridian of longitude, to be subject to the
approval of the President of the United States, and to be
determined by him on actual survey. And said Kansas com-
pany may proceed to build said railroad to the aforesaid point
on the one-hundredth meridian of longitude west from Green-
wich in the territory of Nebraska. * * *

"SEC. 10. *And be it further enacted,* That the said company chartered by the state of Kansas shall complete one hundred miles of their said road, commencing at the mouth of the Kansas river as aforesaid, within two years after filing their assent to the conditions of this act, as herein provided, and one hundred miles per year thereafter until the whole is completed." * * *

Under this act the plaintiff, as appears by the proceedings, filed a map of its general route, and the fifteen-mile strip on either side thereof was duly reserved from sale. This route extended up the Kansas river to the left bank of the Republican, and thence along the bank of said last-named river to the one-hundredth meridian. Subsequently, and on the 2d of July 1864, congress passed an amending act, which increased the land grant, the area of reserved lands, and authorized the plaintiff to connect its road with the main line at other than the one-hundredth meridian, providing however that the grant of bonds or land should not thereby be increased. Again, on the 3d of July 1866, congress passed an act authorizing the location of a new route, the filing of a map thereof, and the reservation of the adjacent lands, § 1 of which is as follows:

"AN ACT to amend an act entitled, 'An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean,' etc. etc., 'approved July 2d 1864.'

"*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That the Union Pacific Railway Company, Eastern Division, is hereby authorized to designate the general route of their said road, and to file a map thereof as now required by law, at any time before the first day of December 1866; and upon the filing of the said map, showing the general route of said road, the lands along the entire line thereof, so far as the same may be designated, shall be reserved from sale by order of the Secretary of the Interior: *Provided,* That said company shall be entitled to only the same amount of the bonds of the United States to aid in the construction of their line of railroad and telegraph as they would have been entitled to if they had connected their said line, with the Union Pacific Railroad on the one-hundredth degree of longitude,

as now required by law: *And provided further*, That said company shall connect their line of railroad and telegraph with the Union Pacific Railroad, but not at a point more than fifty miles westwardly from the meridian of Denver, in Colorado."

In pursuance of this act, and on the 11th of July 1866, the plaintiff filed a map of its newly-selected route up the Smoky Hill, instead of the Republican river, and on the 26th of July 1866 the lands along the line thereof were all duly reserved from sale by order of the Secretary of the Interior. This reservation included all the lands in controversy. Prior thereto the road had been completed to Fort Riley, and soon thereafter work commenced on the extension up the Smoky Hill. On the 14th of December 1866, the president of the company made his affidavit of the completion of twenty miles, and on the 20th of same month the commissioners appointed by the President were directed to make their examination. Before making their examination the company had completed five additional miles, and on the 10th of January 1867 the commissioners were directed to examine and report upon the twenty-five miles of completed road. The commissioners on the 17th of January 1867 reported favorably, and on the 22d of said month the President of the United States approved the same, and directed the issue of patents for lands due the company on account of this completed section of twenty-five miles. All the lands in controversy were covered by this executive order. These are the facts material to the plaintiff's title. From them it seems that two propositions are clearly deducible: first, the lands in controversy were among others on the 26th of July 1866 duly and legally reserved from sale, and second, that as between the U. S. and the plaintiff full title to these lands passed, at least upon the approval of the President of the report of the commissioners, and the order to issue patents. It is probable that title passed upon the permanent location of plaintiff's road adjacent to these lands, but as the time of such location is not definitely shown by the findings, and as

a vesting of title prior to the approval of the President would not, in the conclusions to which we have come, have any effect upon the decision, we forbear further inquiry in that direction. So far as the action of the President was required, the subsequent approval was equivalent to a prior selection of the route.

Turning now to the claim of defendant, let us see upon what it rests. The first act in its chain of title was approved March 3d 1863. So much as is material is as follows:

"AN ACT for a grant of lands to the State of Kansas, in alternate sections, to aid in the construction of certain Railroads and Telegraphs in said state.

"*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That there be and is hereby granted to the State of Kansas, for the purpose of aiding in the construction, * * *: Second, of a railroad from the city of Atchison, *via* Topeka, the capital of said state, to the western line of the state, in the direction of Fort Union and Santa Fé, New Mexico, with a branch from where this last-named road crosses the Neosho, down said Neosho Valley to the point where the said first-named road enters the said Neosho Valley — every alternate section of land designated by odd numbers, for ten sections in width on each side of said road and each of its branches. But in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected, for the purpose aforesaid, from the public lands of the United States nearest to the tiers of sections above specified, so much land, in alternate sections or parts of sections, designated by odd numbers, as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated, or to which the rights of preëmption or homestead settlements have attached as aforesaid; which lands, thus indicated by odd numbers, and selected by the direction of the Secretary of the Interior as aforesaid, shall be held by the state of Kansas for the use and purpose aforesaid: *Provided,* That the land to be so selected shall in no case be loca-

ted further then twenty miles from the lines of said road and branches: *Provided further,* That· the lands hereby granted for and on account of said roads and branches severally shall be exclusively applied in the construction of the same, and for no other purpose whatever, and shall be disposed of only as the work progresses through the same, as in this act hereinafter provided: *Provided, also,* That no part of ·the land granted by this act shall be applied to aid in the construction of any railroad or part thereof, for the construction of which any previous grant of land or bonds may have been made by congress: *And provided further,* That any and all lands heretofore reserved to the United States, by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operations of this act, except so far as it may be found necessary to locate the routes of said road and branches through such reserved lands; in which case the right of way only shall be granted, subject to the approval of the President of the United States."

In this act was no grant affecting in any way the lands in controversy; but the legislature of the state of Kansas (Laws 1864, p. 151,) in accepting on the 9th of February 1864 this grant, and transferring certain of the lands to the A. T. & S. F. Railroad Co., added this proviso:

"*And provided further,* That if the congress of the United States shall, on or before the 4th of March 1866, consent that the Neosho Valley branch of the above-named road may be extended so as to intersect the Union Pacific Railroad, Eastern Division, at or near Fort Riley, and shall make a grant of land for such extension of like amount with that granted per mile for the construction of the herein above-named principal road, then said Atchison, Topeka & Santa Fé Railroad Company shall proceed to construct such branch to such intersection, on the terms and conditions herein above prescribed, applicable to the construction of such main road."

In pursuance of this implied request congress, on the 1st of July 1864, passed an act making a land grant to the state of Kansas to aid in the construction of the road indicated in the above proviso, which grant was made expressly "subject to all the provisions, restrictions, limitations, and conditions

in regard to selection ·and location of lands, and otherwise," of the act of congress of March 3d 1863, heretofore noticed. Subsequently, with the assent of the state, the A. T. & S. F. Railroad Co. transferred to the defendant all its interest in this grant, and on the 26th of July 1866, congress passed a new act granting lands, of which the title and the first section are as follows:

"AN ACT granting lands to the State of Kansas, to aid in the construction of a southern branch of the Union Pacific Railway and Telegraph from Fort Riley, Kansas, to Fort Smith, Arkansas.

"*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That for the purpose of aiding the Union Pacific Railroad Company, Southern Branch, the same being a corporation organized under the laws of Kansas, to construct and operate a railroad from Fort Riley, Kansas, or near said military reservation, thence down the valley of the Neosho river to the southern line of the state of Kansas, with a view to an extension of the same through a portion of the Indian Territory, to Fort Smith, Arkansas, there is hereby granted to the state of Kansas, for the use and benefit of said railroad company, every alternate section of land or parts thereof, designated by odd numbers, to the extent of five alternate sections per mile on each side of said road, and not exceeding in all ten alternate sections per mile; but in case it shall appear that the United States have, when the line of said road is definitely located, sold any section, or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected, for the purposes aforesaid, from the public land of the United States nearest to the sections above specified, so much land as shall be equal to the amount of such lands as the United States have sold, reserved, or otherwise appropriated, or to which the right of homestead settlement or preëmption has attached as aforesaid, which lands, thus indicated, by the direction of the Secretary of the Interior shall be reserved and held for the state of Kansas for the use of said company by the said secretary for the purpose of the construction and operation of said· railroad, as provided by this act: *Provided,* That any

and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or other purpose whatever, be and the same are hereby reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right of way, two hundred feet in width, is hereby granted, subject to the approval of the President of the United States: *And provided further*, That said lands hereby granted shall not be selected beyond twenty miles from the line of said road."

The Union Pacific Railroad Co., Southern Branch, named in said act, is the defendant here, the name having been subsequently changed to that of the M. K. & T. Railway Co. Between the 5th and 20th of September 1866, the defendant caused its line to be surveyed and made on the ground adjacent to the lands in controversy, which survey and location was approved by the board of directors of the defendant, and a map thereof filed in the office of the Secretary of State of the State of Kansas on November 14th 1866, and in the office of the Secretary of the Interior December 16th 1866. On the 9th of June 1870 the defendant's road was completed to the south line of the state, accepted by the governor, and by him certified to the Secretary of the Interior as a first-class railroad, and thereupon accepted by the President. This constitutes the defendant's chain of title.

Looking merely to the granting-clause in these acts under which defendant claims, and the words used are words of present grant — "That there be and is hereby granted." Now if there were any designation of specific tracts, or any reference to existing lines, whether natural or artificial, from which by mere survey and measurement the specific tracts could be ascertained, it might well be said that the title to those tracts passed immediately, subject to be defeated by a failure to perform the conditions of the grant. Perhaps too, if there were no other limitation than the want of a definitely located line of road, the location of the road would make the grant operative from the day of its date, and thus cut off all

intervening claims. But other limitations appear in both the acts of March 3d 1863, and July 26th 1866. It is provided 'that "in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section or any part thereof granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, *or that the same has been reserved by the United States for any purpose whatever,* then it shall be the duty of the Secretary of the Interior to cause to be selected for the purposes aforesaid from the public lands of the United States nearest to the tiers of sections above specified so much land * * * as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated," etc. This limitation operates to exclude from the grant any lands which at the time the line of road is definitely fixed have been by the United States reserved for any purpose whatsoever. It leaves the specific sections undetermined until the definite location of the road, and then excludes from the grant any lands to which adverse rights and interests have attached. Now, from the findings it appears that the line of defendant's road, adjacent to these lands, was not definitely fixed until between the 5th and 20th of September 1866, but on the 26th of July prior thereto they had been by the United States duly reserved, in pursuance of positive and direct legislation therefor. It seems to us that they were by the very terms of the acts under which defendant claims excluded from the operation of its grant, and that therefore there is nothing in defendant's claim to interfere with the title which passed to the plaintiff by the completion and acceptance. by the President of the United States of its road. As the facts seem to be undisputed, we can but think the case of *Johnson v. Towsley,* 13 Wall., 72, leaves the courts free to apply the law correctly to those facts, and as in the view we have taken of the law the plaintiff has the better title to these lands, it becomes our duty to so adjudge. Inasmuch as no exception appears to have been taken to the facts as found, it is also our duty, under the law, to

3 — 15 KAS.

make, so far as the courts of this state are concerned, a final disposition of the case.  The judgment of the district court will therefore, as to the lands adjudged by it to the defendant, be reversed, and the case remanded with instructions, as to those lands, to enter judgment for the plaintiff, as prayed for in the petition.

All the Justices concurring.