McGOLDRICK LUMBER CO. v. KINSOLVING et al.

(Circuit Court of Appeals, Ninth Circuit. March 18, 1915.)

No. 2429.

1. PUBLIC LANDS ⬯102—CANCELLATION OF FINAL RECEIPT—SUFFICIENCY OF EVIDENCE.

In a suit to establish a trust in land, which defendants held under a patent from the government, on the ground that a final receipt of the register and receiver under an application to purchase such land by S., under whom plaintiff claimed, was canceled by the land department wrongfully and without authority of law, evidence introduced before the register and receiver *held* to justify a finding that S. purchased the land with money furnished him by other parties with a view to their own profit, to come out of the land when the title was secured.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 294–297; Dec. Dig. ⬯102.]

2. PUBLIC LANDS ⬯33, 42—COMPLIANCE WITH STATUTE—NECESSITY.

One seeking to acquire public lands either by donation or sale must comply with the provisions of the statute and observe the things prescribed by law, and also refrain from the things inhibited as a condition to the acquirement of title.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 57–64, 106, 107; Dec. Dig. ⬯33, 42.]

3. PUBLIC LANDS ⬯106—CONCLUSIVENESS OF DEPARTMENTAL DECISIONS.

In administering the laws relative to the disposition of the public domain, the findings and decisions of the land department as to matters of fact pertaining to applications, entries, and proofs are final and conclusive, if there is any pertinent testimony upon which to base them.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. ⬯106.]

4. PUBLIC LANDS ⬯106—CONCLUSIVENESS OF DEPARTMENTAL DECISIONS.

Whether an application to purchase land under the Timber and Stone Act (Act June 3, 1878, c. 151, 20 Stat. 89) was made for speculative pur-

poses, in that the applicant was furnished the money by other persons with a view to their own profit, was a question of fact for the consideration of the land department on a contest, as to which its decision was binding and conclusive.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. ☞106.]

5. PUBLIC LANDS ☞138—BONA FIDE PURCHASERS—EQUITABLE TITLES.

A final receipt, issued to an applicant for the purchase of land, was only evidentiary of an equitable title, and as to such a title, under either the pre-emption laws or the Timber and Stone Act, the bona fide purchaser doctrine cannot apply.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. ☞138.]

6. PUBLIC LANDS ☞106—CONCLUSIVENESS OF DEPARTMENTAL DECISIONS.

Where there was pertinent evidence before the land department on a contest of an application to purchase public lands, its decision on a question of fact was conclusive, though its reasoning was erroneous.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. ☞106.

Decisions of land department, their conclusiveness and effect, see notes to Hartman v. Warren, 22 C. C. A. 38; Carson City Gold & S. M. Co. v. North Star Min. Co., 28 C. C. A. 344; Uinata Tunnel M. & T. Co. v. Creede & C. C. M. & M. Co., 57 C. C. A. 207.]

7. PUBLIC LANDS ☞103—CONTESTS—EVIDENCE.

Where S., after making a homestead entry, agreed with M. to convey him an undivided interest in the land when final proof had been made, but, being unable to make final proof because of his failure to live on the land, he filed an application to purchase the land under the Timber and Stone Act, to which application a contest was filed on the ground that the entry was speculative, and that the money to purchase the land was furnished by other parties with a view to their own profit, the agreement with M. should have been admitted at the hearing on such contest as showing the inclination of S. to obtain title to the land, regardless of the regulations of law, especially as it had a bearing on M.'s money demand against him, the amount of which was withheld and paid to M. by one to whom S. conveyed after obtaining his final receipt.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 298, 299, 307; Dec. Dig. ☞103.]

8. PUBLIC LANDS ☞103—CONTESTS—SUFFICIENCY OF ALLEGATIONS.

Under the practice long maintained in the land department, a contest against an application to purchase land under the Timber and Stone Act, alleging that the applicant had agreed with M. to convey to him an undivided one-half interest in the land when he had made final proof, that after submitting his final proof and receiving the receiver's receipt the applicant conveyed to J., who subsequently conveyed to other parties, that the purchase money paid the government was furnished by other parties, who in consideration thereof were to receive a portion of the money paid for the land by such grantees, that the applicant received no more than one-third of the purchase price, and the balance was paid to those so furnishing him money with which to make final proof, that on account of the matters so alleged the entry was made for speculative purposes, and not for the sole and exclusive benefit of the applicant, and that by reason of such agreements and contracts the applicant did not receive the full consideration and value of the land, contained sufficient allegations upon which to base the contest.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 298, 299, 307; Dec. Dig. ☞103.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Northern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the McGoldrick Lumber Company against Charles J. Kinsolving and others. Decree for defendants, and complainant appeals. Affirmed.

This suit was instituted by appellant, complainant below, to have the appellees declared the holder of the legal title to the land in the bill of complaint described, in trust for the appellant. The defendant Charles J. Kinsolving acquired title by patent from the United States March 27, 1911, in pursuance of a lieu selection theretofore made. The remaining defendants, it is alleged, have or claim some interest in the property. The plaintiff claims that he is entitled to have the trust so declared by reason of one John Shannon, under whom plaintiff deraigns title, having filed in the proper land office an application for purchase under the Timber and Stone Act, and having secured, after final proof made by him, a final receipt from the register and receiver, which receipt, it is alleged, was wrongfully and without authority of law canceled by the land department. Shannon had previously, to wit, on July 17, 1905, made homestead entry; but, being unable to make final proof by reason of his not having lived upon the land or cultivated any part of it, he, on September 26, 1906, relinquished the same, and at once filed his application to purchase under the Timber and Stone Act. He made final proof under this latter application January 16, 1907, which being accepted and the money consideration paid, the receiver issued to him the final receipt, being No. 2,500.

On July 16, 1907, Kinsolving filed in the land office a contest against Shannon's timber and stone application, setting forth for cause thereof that Shannon on September 24, 1906, made and entered into an agreement with one William McCarter, by the terms of which Shannon undertook to convey to McCarter an undivided one-half interest in the land when he had made final proof and received the receiver's certificate; that after said Shannon had submitted his final proof and received the receiver's receipt he conveyed said land by deed to one Joseph H. Johnson, who subsequently conveyed to Roy C. Lammers and the McGoldrick Lumber Company; that the purchase money paid to the government was furnished by other parties, who in consideration thereof were to receive a portion of the money to be paid for the land by Lammers and the McGoldrick Lumber Company; that when said money was paid Shannon received no more than one-third thereof, and the balance was paid to those so furnishing him the money to make final proof, and on account of the matters and things so alleged that said entry No. 2,500 was made for speculative purposes, and not for the sole and exclusive benefit of said applicant; and that applicant, by reason of his said agreements and contracts, did not receive the full consideration and value of said land.

Upon notice duly given a hearing was had before the register and receiver, and a copy of the proceedings had and the testimony taken thereat is attached to and made a part of the bill of complaint. Based upon such proceedings and testimony the register and receiver made and rendered findings and decision, and canceled Shannon's entry. The record further shows that a demurrer was interposed to the contest affidavit filed by Kinsolving, and overruled. It further appears that an appeal was had to the Commissioner General of the Land Office, and from his decision to the Secretary of the Interior, and that the decision of both of these officers was in affirmance of the decision of the register and receiver.

There was further testimony adduced before the trial court, but in the end its decree was based upon the testimony and the proceedings had before the register and receiver, and, being adverse to complainant, it has prosecuted an appeal to this court.

F. M. Dudley, of Seattle, Wash., Cullen, Lee & Matthews, of Spokane, Wash., and John P. Gray, of Cœur d'Alene, Idaho, for appellant.

J. H. Forney, Frank L. Moore, and R. B. Norris, all of Moscow, Idaho, for appellees Kinsolving and Milwaukee Lumber Co.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] The appellant contends (adopting the statement of counsel contained in their brief):

"That there was no evidence whatever upon which the land department could cancel the entry of Shannon, and that under the rules of law governing the cancellation of entries, both as announced by the federal courts and as anounced by the land department, the cancellation of the entry was wrongful on the part of the land department, and that the action of the land department was the result of an error of law."

This involves a review of the testimony adduced before the register and receiver, and considered by them and the Commissioner General and the Secretary of Interior in making and rendering their decision. There is much of the testimony that is of no value whatever, and no reference will be made to it. By stipulation of counsel it appears that two other contests were previously filed, one by John English and another by Fred Hamilton, both of which were dismissed on motion of protestant.

Shannon was called, and testified, in effect, that prior to his making final proof he resided in Cœur d'Alene, Idaho, and had resided there up to the time of the rehearing, May 21, 1908—about six years; that he had known Joseph H. Johnson a year or thereabouts prior to making final proof; that he (Shannon) stopped at his place and roomed there when he came to town, and borrowed some money of him, once in a while, $10, $20, or $30 at a time, which was about all the business transactions had with him up to that time; and that he became indebted in the meanwhile to Johnson in about the sum of $2,900. Then as interrogated:

"Q. Now, on the date that you got your final receipt, you gave Mr. Johnson a deed for this land, didn't you? A. Not that I know of; not that I can remember of very well. Q. Do you say that you did not? A. Not that I can remember of; if I did, it was not my natural signature. Q. If you gave Mr. Johnson a deed for this land on the 16th day of January, 1906, the same day that you got your receiver's receipt, then it was not your natural signature; is that right? A. Yes, sir. Q. Who did you ever deed this land to, then? A. I deeded it to Roy C. Lammers. Q. Is that the only person you deeded it to? A. That is the only person I ever knew of deeding it to; if I did, I was not in shape to do business."

Shannon further testified that he had money beyond what he got from time to time from Johnson, that his brother at Columbia Falls, Mont., owed him for money loaned along about 1895, which was on interest, and that his brother sent him $500 through the mail, being in the form of five $100 bills in a common letter, unregistered, and that out of this remittance he made payment for his claim. And again as interrogated:

"Q. Now, do you remember whether or not you received any money on account of your receiver's receipt, prior to the time you made this deed to Lammers? A. No, sir. Q. You did not receive any at all? A. No, sir; you say prior to the time I deeded this land to Lammers? Q. Yes. A. Oh, yes; certainly I did. Q. Who did you get that from—Johnson? By Mr. Elder:

I object to him leading his own witness. Q. Who did you get it from? A Mr. Johnson, the most of it; but from several people. Q. I mean on account of this claim? A. Oh, on account of this claim. Q. You don't remember of signing this deed on the 16th day of January, 1906? A. No; I don't. By Mr. Dudley: Do you recollect giving any mortgage or paper to Mr. Johnson right after you proved up on the 16th day of January? A. No, sir. Q. You have no recollection of that at all? A. No, sir. Q. Do you recollect making an affidavit, Mr. Shannon, at the time you gave this deed to Mr. Lammers? A. Yes. Q. I call your attention to this paper, Contestant's Exhibit D, for identification (reads): Is that the affidavit you made at the time? A. Yes. Q. Now, in that affidavit you will notice that it says that you are the grantor in that deed, dated January 16, 1907. Does that refresh your memory? Do you remember of making any conveyance to Johnson? A. I can't remember. Q. You don't remember whether you did or not? A. No, sir. Q. At the time you made this affidavit you had those facts that you swore to fresh in your mind? A. Yes. Q. And the affidavit was true as you swore to it? A. Yes. Q. You say that you owed Mr. Johnson at the time Mr. Lammers bought that land something like $2,900? A. Yes. Q. And that debt has arisen partly out of money that you owed him for room rent and money he loaned you? A. Yes. Q. During what time did your loans cover? A. The most of them was loaned from along about the 1st of February until about the date of the sale. Q. Did Mr. Johnson have any agreement with you whatever, at the time you entered this land January 16th, by which you agreed, when you entered it, that you would convey that land to him? A. No, sir. Q. Did you make any agreement of that kind with any one whatever? A. No, sir. Q. And the only person you recollect that you made any conveyance to was Mr. Lammers in April? A. Yes, sir."

Exhibit D, referred to in witness' testimony, is an affidavit given by him April 25, 1907, whereby he deposed:

"That affiant's attention has been called to an abstract of title to said lands which shows, among other things, an agreement between affiant and one William McCarter, dated September 24, 1906, and recorded in the office of the county recorder of Shoshone county, Idaho, January 21, 1907, in Book E of Agreements, on page —— thereof, by which it is recited that affiant agrees to convey an undivided half interest in and to said lands to said William McCarter as soon as affiant should make final homestead proof of said lands and receive the receiver's receipt therefor; that in truth and in fact affiant never made or signed such agreement, or any agreement, to convey said lands, or any thereof. or any interest therein, to any one; and that, if there is any agreement such as purports to be shown in such abstract signed in affiant's name, the name is a forgery."

In this relation reference should be had to the affidavit of William McCarter, the person with whom the alleged agreement was made, offered and received in evidence, who deposed with relation thereto as follows:

"That at the time of executing said contract the said Shannon was indebted to affiant in a large sum of money, and that affiant was very desirous of procuring some security for the payment thereof, and that affiant procured the signature of said Shannon to said contract solely for the purpose of holding the same as security by means of which he could compel said Shannon to pay such indebtedness, and that it was not the purpose or intention of affiant to ever assert any title to said lands, or to any interest therein, or in any therefor, under said contract; that affiant well knew, at the time of procuring said pretended agreement, that the same was void and unenforceable, but that affiant believed that he could, by means thereof, induce and compel said Shannon to pay to affiant the indebtedness due to affiant from said Shannon; that at the time of executing and delivering said paper to affiant the said Shannon had been drinking for many days, and was in such a condition, as the

result of such drinking alcoholic drinks, that he, the said Shannon, had no comprehension of his act, and thereafter had no recollection of executing or delivering such paper to affiant, and that the said Shannon has since believed, and now, as affiant is informed and believes, that he, said Shannon, never signed or delivered such contract, and that his signature thereto is a forgery; that it was never the purpose or intention of said Shannon to agree to convey to affiant said lands when he should enter the same, or any interest therein, or in any of them; that said paper was filed for record in the office of the county recorder of Shoshone county, Idaho, after affiant had been informed that said Shannon had conveyed said lands to one Joseph H. Hamilton, for the purpose of using the same as a means whereby affiant could secure from said Shannon payment of the moneys owing by said Shannon to affiant."

Jos. H. Johnson testified, in effect, that he had known Shannon about three years, that he (Shannon) was always a customer at his hotel and saloon, and that he had never had any business transactions with him prior to January 16, 1907, "more than a customer"; that he (witness) was the same Joseph H. Johnson to whom Shannon gave a warranty deed for the land in question on January 16, 1907; that the deed, as shown by witness' affidavit, a copy of which had been previously offered in evidence, was given as a mortgage only, and that he did not know how much Shannon owed him at the time it was given; that he did not give to Shannon any instrument showing that he held title merely as mortgagee; that he never at any time prior to January 16, 1907, had any conversation with Shannon relative to his securing witness for the money he owed; that the first time he had any conversation with Shannon relative to security was three or four or five hours after the receiver's final receipt was issued to Shannon; and that, when the deed was made by Shannon to Lammers, Lammers gave to witness a check for $2,939. And on cross-examination: That Shannon had been doing business with him (witness) in connection with his bar for a year or two prior to January, 1907, and "was a pretty heavy drinker"; that when he (Shannon) ran short of money he would borrow from witness $10, $15, or $20 at a time, and that it was then agreed between witness and Shannon that the latter was owing witness at the time $2,939; that when the transaction was had with Lammers he took a deed from both witness and Shannon, and that prior to Shannon's entry of the land he had no understanding, directly or indirectly, with him, whereby Shannon was to convey the land to him after making the entry. Witness, on being recalled, further stated that, since witness had known Shannon, he had "used liquor * * * very excessively," and that in witness' opinion such use "had impaired his memory and mental faculties."

Roy C. Lammers testified that he secured an abstract of title to the property just prior to the completion of his purchase; that certain affidavits were obtained and extended on the abstract for clearing up the title; that McCarter told witness that Shannon owed him (McCarter) $600, and to withhold the amount from the purchase price of the land, and witness agreed to do so; that there is nothing in the deed from Johnson to witness, or Shannon to witness, to show that witness was trustee for the McGoldrick Lumber Company; and that witness disposed of the consideration he agreed to pay for the land as follows:

Paid to Shannon ....................................................... $   350
Paid to Joseph Johnson ..............................................   2,939
Paid to Ralph T. Morgan .............................................     900
Deposited in Exchange National Bank, Cœur d'Alene, to credit of Shan-
   non ...............................................................   1,757
Paid to William Dollar, president of Exchange National Bank .......     200
Paid to R. E. McFarland .............................................     100
Paid to Dan McLaren .................................................      50
Paid to Calhoun Hardware Company ...................................      24
Paid to Winship & Henderson ........................................      80
Withheld, to be paid McCarter ......................................     600
And to be paid to Shannon, when the patent issued from the govern-
   ment ..............................................................   1,000

Upon cross-examination witness further testified that he first be-
came acquainted with the land in the fall of 1906, "somewhere along
in September or October," and first talked with McLaren about the
purchase of the land under his option from Johnson; that witness had
previously seen in the daily abstract sheets that Johnson had the title,
and that he (witness) had the land along with the entire basin cruised;
that McLaren's option expired before the purchase was completed, and
that another was given by Johnson to witness; that Johnson gave
witness a warranty deed in pursuance of the option; that Shannon
delivered his deed to witness at the same time; that Johnson made
the statement when the transaction was being closed that the deed
from Shannon to himself was given as security for the amount that
Shannon owed him; that witness' attention was called to an instru-
ment purporting to be a contract between Shannon and McCarter,
whereby Shannon agreed in consideration of $1,000 to convey to Mc-
Carter the land in contest when the former proved up on his home-
stead entry; that Shannon was then and there asked if he had ex-
ecuted such an instrument, and that he denied that he had; and that
witness agreed to pay Shannon $8,000 for the land, $1,000 of which
was to be withheld until such time as the patent was issued; and,
further, that witness never in any form opened negotiations for the
land or advanced any money in any way to Shannon prior to the
time that he took the matter up with McLaren, and that he had not,
prior to that time, any notice or knowledge whatsoever "that there
was any claim or that there was anything wrong with this (Shannon's)
entry."

Sam L. McFarland testified that Shannon in a conversation con-
cerning the contest remarked to witness as follows:

"Well, that contract that I signed with McCarter was before I relinquished
my homestead, and had nothing to do with my timber and stone."

R. T. Morgan testified that he was employed along in January, 1907,
by Johnson and Shannon to defend a contest entered against Shan-
non's claim by John English; that he defended another contest en-
tered by Hamilton, and continued in their employ until the matter
was finally disposed of in the land department, and until the transfer
of Shannon's interest to either Lammers or the McGoldrick Lumber
Company, and that Mr. Crane was associated with him in the services
rendered; that Johnson paid him a retainer fee, and that Shannon
paid him $900 through Lammers, being balance due for his services;

that Lammers had been previously informed of the arrangement touching witness' employment; and, being asked, "Do you remember what the previous arrangement was and where made?" he answered:

"I don't know where it was made, but it was a matter that I think was understood between myself, Mr. Johnson, and Mr. Lammers, that I should receive that fee in case of the successful termination of this contest, and Mr. Lammers was informed of that fact and paid me the money or gave me the check."

Witness further stated:

"So far as my knowledge goes, there was nothing at any time—never one dollar paid to any one in consideration of dismissing any contest or for any consideration with reference to the litigation of this Shannon claim."

Earl Saunders testified that he drew the deed given by Shannon to Johnson, and that he has no recollection of the parties saying anything to him with reference to the deed being intended as a mortgage.

[2, 3] The public domain is disposed of only by authority of Congress, and those who would acquire title to any part of such domain must do so in pursuance of some law or act of Congress, permitting the acquisition and prescribing the terms and conditions upon which it may be had. Much of the domain has been, and is being, disposed of by donation to settlers, and much by sale to purchasers; but, whether it be by donation or sale, the provisions of the statute must be complied with in order to entitle the donee or purchaser, as the case may be, to his title from the general government. The things prescribed by law must be observed, and the things inhibited as a condition to acquirement of title it is just as essential shall not be done. Thus, if the law provides for settlement, improvement, and occupancy for a definite period of time, it is incumbent upon the applicant to observe these conditions; otherwise he cannot acquire the title. And if, upon the other hand, the law provides that he shall not purchase for speculative purposes, or shall not have, prior to filing his application to purchase, disposed of or entered into any agreement for the sale of such land, these constitute conditions of the purchase, and, unless observed, he cannot have his title. The acquirement of title in contravention of law is not only a fraud upon the law, but is a fraud upon the government, which owns and has the disposition of the public domain. The land department is charged with the administration of the laws of Congress relative to the disposition of the public domain. It must see that the provisions of law are complied with by intending donees and purchasers, and is constituted a tribunal for determining and deciding all matters of fact pertaining to applications, entries, and proofs, and by the uniform holding of the Supreme Court its findings and decisions as to such matters are final and conclusive, if it be there is any pertinent testimony upon which to base them. If the officers of the land department err in the construction of the law applicable to any case, or if fraud is practiced upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reversed and annulled by the courts in controversies be-

tween private parties founded on their decisions; "but," says Mr. Justice Field in Shepley v. Cowan, 91 U. S. 330, 340 [23 L. Ed. 424]:

"For mere errors of judgment upon the weight of evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department, and perhaps, under special circumstances, to the president."

See, also, Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485; Burfenning v. Chicago, St. Paul, etc., Ry., 163 U. S. 321, 16 Sup. Ct. 1018, 41 L. Ed. 175; Johnson v. Drew, 171 U. S. 93, 99, 18 Sup. Ct. 800, 43 L. Ed. 88; Gardner v. Bonestell, 180 U. S. 362, 369, 21 Sup. Ct. 399, 45 L. Ed. 574; De Cambra v. Rogers, 189 U. S. 119, 122, 23 Sup. Ct. 519, 47 L. Ed. 734.

It has been further said by the Supreme Court that:

"It has also been settled that the fraud in respect to which relief will be granted in this class of cases must be such as has been practiced on the unsuccessful party and prevented him from exhibiting his case fully to the department, so that it may properly be said there never has been a decision in a real contest about the subject-matter of inquiry." Vance v. Burbank, 101 U. S. 514, 519, 25 L. Ed. 929; Greenameyer v. Coate, 212 U. S. 434, 442, 29 Sup. Ct. 345, 53 L. Ed. 587.

[4] The fraud assigned as the basis of inquiry in the present controversy is not of that nature, but relates to the acts and doings of Shannon in alleged contravention of the law, namely, the Timber and Stone Act, while seeking to acquire title to the land in question from the government. This presents a question of fact for the consideration of the land department, and its decision with respect thereto is as binding and conclusive upon the parties as its decision would be upon any other question of fact pertaining to the attempted purchase.

Very true, the power possessed by the land department is not an unlimited or an arbitrary power (Cornelius v. Kessel, 128 U. S. 456, 9 Sup. Ct. 122, 32 L. Ed. 482, and Orchard v. Alexander, 157 U. S. 372, 15 Sup. Ct. 635, 39 L. Ed. 737); but no such arbitrary power was attempted to be exercised by the department here. It was only the power to decide questions of fact, and the only error assignable is one of law, whether it had any evidence before it upon which to make the findings complained of.

[5] Furthermore, while it is true that Shannon acquired a vested interest to the land in question by the final receipt, yet the receipt was only evidentiary of an equitable title, and not of the ultimate title which is evidenced by the patent. As to such an equitable title, the innocent or bona fide purchaser principle or doctrine does not or cannot apply. It has been so adjudged, both as to the pre-emption laws and the Timber and Stone Act. Root v. Shields, Woolw. 340, 348, 363, Fed. Cas. No. 12,038; Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157.

[6] Now, starting with these settled legal principles, we have only to discuss the evidence that the land department had to deal with in arriving at its decision in the premises; nor are we bound by the reasoning adopted by the officers of the department in arriving at the conclusion reached. It is sufficient if there was pertinent evidence before

them for consideration, no matter what their reasoning may have been.

[7] It is at once apparent from the testimony that Shannon, from the very inception of his purpose of acquiring title to the land in question, attempted to proceed in violation of the prescribed regulations of law. He first made a homestead entry, and not only did he fail to live upon the land and to cultivate any part of it, but he entered into an agreement with McCarter prior to final proof for a sale of an interest in the same, which was contrary to the intent and purpose of the Homestead Act. Bailey v. Sanders, 228 U. S. 603, 33 Sup. Ct. 602, 57 L. Ed. 985. Finding that he could not make the requisite proof to entitle him to his homestead, presumably a commuted homestead, he immediately applied to purchase under the Timber and Stone Act, and the agreement with McCarter of September 24, 1906, continued in force, being neither canceled nor annulled.

It is urged that this agreement ought not to be considered, because not admitted at the hearing before the register and receiver. We think those officers erred in their ruling; but, whether the agreement was admitted or not, the answer of defendants admits its execution, and the testimony otherwise adduced, including the affidavits admitted, show that it was, in fact, entered into by the parties. The agreement was pertinent, if for no other reason, to show the inclination of Shannon to obtain title to the land regardless of regulations of law. It also has a bearing on McCarter's money demand made against him, and which was withheld by Lammers out of the purchase price of the sale made to the latter.

The maxim that a witness false in one part of his testimony is to be distrusted in others may be by parity of reasoning applied to Shannon. He, having been discovered in the act of defrauding the government in one transaction, would quite naturally be distrusted in another, especially where there is a close relationship and marked similarity between the two transactions.

Turning to another phase of the testimony, it appears that Shannon was a man who drank heavily, "very excessively," says Johnson, and to such an extent that it "impaired his memory and mental faculties"; that Johnson's acquaintance with Shannon extended back from the date the deeds were given to Lammers, about a year and nine months, or less than two years; that Shannon was merely a customer of Johnson's at his hotel and bar, and borrowed small sums of money from time to time; and yet it is asserted by Johnson that within that time Shannon became indebted to him in the sum of $2,939. When inquired of for an accounting, Johnson says he kept no account, but that as Shannon became indebted to him from time to time Shannon gave his I. O. U.'s, which were all destroyed as settlements were subsequently made. With all this we find that within two or three hours after Shannon procured his final receipt Johnson had his warranty deed for the land, which deed, it was later claimed, was given as a mortgage to secure money. There was no defeasance given, nor was Johnson able to give on the witness stand any definite idea as to the amount Shannon then owed him. Shannon says he got the money with which to pay for

the land from his brother, who had owed him from about 1895, and yet it seemed necessary that he should at once execute a mortgage on the land to Johnson. Further, Shannon affirms that he has no recollection of giving the deed to Johnson.

And, again, it may be inquired how did Shannon become indebted to McCarter? McCarter failed to enlighten the register and receiver, although he made an elaborate affidavit touching the agreement on Shannon's part to convey to him an undivided half of the land when the final homestead proofs were made. Eventually McCarter claimed that the agreement was executed to secure the payment of a large sum of money. But McCarter's narrative of the way by which he procured the execution of the agreement, and the purpose he had in view in obtaining the same, shows a degree of perfidy that is amazing and unconscionable, and is sufficient within itself to render him wholly unworthy of belief. Johnson's testimony inherently renders it scarcely worthy of greater credence. And what is the inference to be drawn from their acts and demeanor towards Shannon? Very naturally that Shannon was the tool and dupe of these men, and was but a pliant instrument in their hands, and that they, one or both of them, provided him with the money whereby to complete his purchase, with a view to their own profit to come out of the land when the title was secured from the government. It cannot be predicated of such a record that it contains no pertinent evidence upon which to base the findings and decision of the land department.

[8] Another point is made that the allegations set forth by the contestant were insufficient upon which to base the contest, but under the practice long maintained in the land department the point is without merit.

The decree of the District Court will be affirmed, with costs to the appellees.