THE STATE, ROBERT H. McCARTER, ATTORNEY-GENERAL, PLAINTIFF IN ERROR, v. THE SOOY OYSTER COMPANY, DEFENDANT IN ERROR.

Argued June 29, 1909—Decided January 6, 1910.

On error to the Supreme Court.

For the plaintiff in error, *Clarence L. Cole, William C. French* and *Howard L. Miller.*

For the defendant in error, *George A. Bourgeois.*

GARRISON, J. (affirming). An action of ejectment tried in the court below resulted in the direction of a verdict for the defendant.

The single question in the case is raised on the refusal of the court to receive the oral testimony offered by the plaintiff to impeach the validity of the defendant's riparian grant for the lands in dispute, the purpose of the plaintiff being to show by such testimony that such land was in point of fact natural oyster beds within the meaning of the statute of 1888. *Pamph. L., p.* 140.

If this testimony was properly rejected it is not contended that the direction of a verdict was otherwise erroneous.

The bill of exceptions shows that the land was covered by tidal waters which made a *prima facie* case for the plaintiff, to meet which the defendant introduced in evidence a grant of said lands made by the riparian commissioners on November 25th, 1903, to E. T. and W. T. Sooy under the great seal of the state pursuant to an act of the legislature approved March 21st, 1871. It was admitted that the defendant had a regular chain of title under this grant. At this stage of the trial the plaintiff offered to prove, in rebuttal, by witnesses, who knew the characteristics of the land in dispute, that such lands had on them at the time of the making of said grant natural oyster beds within the meaning of the amendment to the Riparian act of 1888, which reads as follows:

"That no grant or lease of lands under tidewater whereon there are natural oyster beds shall hereafter be made by the riparian commissioners of this state, except for the purpose of building wharfs, bulkheads or piers."

Objection to the introduction of this testimony being made by the defendant, the court ruled that the grant could not be attacked by such proof in an action of ejectment, and, no other testimony being offered, directed a verdict for the defendant.

The exception allowed the plaintiff to each of these rulings presents the same question which, for convenience, may be divided as follows: *First,* whether or not the proffered proof was a collateral attack upon the riparian grant? *Second,* whether the validity of such grant could be thus impeached in an action of ejectment? and *third,* whether the fact that the plaintiff was the attorney-general acting in his official capacity made any difference?

1. That the testimony offered by the plaintiff was a collateral attack upon the defendant's riparian grant is too clear to justify extended discussion. The plaintiff by his action of ejectment sought to obtain a judgment awarding possession of the premises; when his course to this end was barred by the introduction of the defendant's riparian grant the plaintiff sought to get rid of such grant in such action by impeaching its validity by oral testimony as to a matter of fact not suggested on the face of the grant. This was of the very essence of collateral attack.

2. The more debatable question is whether the proffered testimony tended to show that the grant was *dehors* the jurisdiction conferred upon the riparian commissioners, for, if it was, the invalidity of the grant arising from such unwarranted assumption of jurisdiction could be set up anywhere by anyone who was injured by it.

Counsel have therefore correctly apprehended that the question on which their controversy turns is one of jurisdiction, but counsel for the plaintiff in error, in contending, as he does, that the rejected testimony would have shown that the riparian commissioners acted outside of their jurisdiction,

loses sight, as it seems to me, of the distinction between jurisdiction in its comprehensive sense and the adequate authority to make a particular grant which is loosely called the jurisdiction to make such grant. This distinction between jurisdiction over a subject-matter generally and the possession of the adequate authority to make a particular disposition respecting it goes to the very heart of the present controversy, for it is the absence of the former alone that exposes such particular act to collateral attack, transgressions of the latter being reviewable only by a direct proceeding.

The distinction between these two conceptions or sorts of jurisdiction is pointed out with great clearness by Mr. Justice Woodhull in his opinion in *Ritter* v. *Kunkle,* 10 *Vroom* 259, construing that section of our Small Cause act, which provides that where the justice has jurisdiction no judgment shall be removed by *certiorari*. The opinion points out that in that section jurisdiction is used in the sense of the adequate authority to render the particular judgment that was rendered, but that, in the first section of the act, jurisdiction is used in its comprehensive sense as defining the class of cases cognizable by justices of the peace.

This same distinction was much more elaborately stated by Mr. Justice Brown delivering the opinion for the Supreme Court of the United States in the case of *Noble* v. *Union River Logging Railroad Co.,* 147 *U. S.* 165.

"It is true," he says, "that in every proceeding of a judicial nature there are one or more facts which are strictly jurisdictional, the existence of which is necessary to the validity of the proceedings and without which the act of the court is a mere nullity, * * * and its invalidity may be shown in a collateral proceeding.

"There is, however," he continues, "another class of facts which are termed *quasi*-jurisdictional, which are necessary to be alleged and proved in order to set the machinery of the law in motion, but which, when properly alleged and established to the satisfaction of the court, cannot be attacked collaterally."

Whatever of difficulty there is in making clear this distinc-

tion is greatly increased, if, indeed, it is not actually created, by the necessity of constantly repeating the definition of each sort of jurisdiction as mention is made of it. In the interest, therefore, both of clarity and of brevity, I shall in this opinion substitute for such cumbersome paraphrases the terms *generic* jurisdiction and *specific* jurisdiction, intending to indicate by the former the existence of those essential facts in the absence of which jurisdiction ought not originally to have been assumed, and by the latter those subsidiary conditions in the presence of which, or rather in the light of which, the authority adequate to the lawful performance of some specific act is rendered questionable.

Using these terms we are able briefly to state the rule: that the lack of generic jurisdiction is available in collateral proceedings, but that the lack of specific jurisdiction is of avail only in some form of direct attack.

It is evident that in a large number of cases the vital question must be whether a given evidential fact affects generic jurisdiction or whether it appertains only to that sort of jurisdiction that Mr. Justice Brown calls *quasi* and that we have agreed to call specific. At all events that is the precise point in controversy in the present case, for if the fact that the lands under tidewater were also natural oyster beds affected the generic jurisdiction of the riparian commissioners, proof of such fact ought to have been received in the action of ejectment, whereas if such fact, if proved, went only to the specific jurisdiction of the commissioners to make the particular grant, such proof was properly rejected.

It is quite aside from this legal proposition to say, however truly, that the riparian commissioners were without authority to grant land on which there were natural oyster beds, for that is only to say that they lacked specific jurisdiction to make the grant, whereas, in order to justify the introduction of the testimony that was rejected at the trial, such proof must have tended to show that the commissioners were without generic jurisdiction in the premises. It is not a question of the lack of authority to make the grant, but of how such lack of authority may be taken advantage of, *i. e.,* whether

by direct or by collateral attack. In other words in order to convict the court below of legal error it is necessary for the plaintiff in error to maintain the proposition that lands under tidewater, if they be also natural oyster beds, are not within the generic jurisdiction of the riparian commissioners. Looking more closely at this proposition, two things are to be noted—*first,* that the more inclusive term, viz., lands under tidewater describes *eo nomine* an integral portion of the public domain, and *second,* that the less inclusive term, viz., natural oyster beds indicates merely certain characteristics or qualities that may or may not be possessed by any given portion of such tidal lands, viz., rigid points of fixation to which embryo oyster spats have attached themselves. This being so, and the riparian commissioners being empowered to grant lands under tidewater, and being forbidden to grant such parts of such lands as possessed the foregoing characteristic, it is entirely obvious that in the performance of their duties such commissioners must of necessity determine whether a given piece of tidal land does or does not possess the characteristics that constitute natural oyster beds, and that such determination must enter into and be evidenced by the act done in performance of this official duty. If this be so, then upon entirely familiar principles, the making of a grant by the riparian commissioners imperatively imports and evidences that such determination, whether right or wrong in point of fact, had been made by them. A riparian grant therefore, in the present state of our statutory law, bears within its own bosom the necessary implication that the commissioners have determined that the lands thus granted did not possess the statutory characteristics that would have prohibited their being granted. If the actual fact be otherwise, the riparian commissioners were, none the less, acting within their jurisdiction in determining the question of fact with respect to which, upon the hypothesis, they reached an erroneous conclusion. For the rule already announced has this corollary, viz., that the existence of generic jurisdiction includes the right to determine questions of fact on which the existence of a specific jurisdiction depends; which determi-

nation, being judicial in character, falls within the established rule respecting the conclusive effect to be given to the findings of special tribunals acting within the scope of their authority.

Assuming, therefore, that, in the case in hand, the riparian commissioners, by reason of their erroneous determination of a question of fact, were without authority to make the grant under which the defendant claimed title, it is none the less true that such error did not go to the generic jurisdiction of the commissioners, but, on the contrary, presupposes such jurisdiction as the basis of the exercise of the very judgment which, upon the hypothesis, turned out to be erroneous. The conclusion therefore is irresistible that testimony whose only tendency was to show that the riparian commissioners committed error in the determination of a question of fact which they had the requisite jurisdiction to determine appertained only to the specific jurisdiction of the commissioners to make the particular grant, and hence, under the rule already laid down, was not available for the purposes of a collateral attack upon the validity of such grant.

It will serve, I think, a useful purpose to say, at this point, that if the legislature had itself specified what lands should not be granted, as, for instance, if it had forbidden the granting of lands beneath the Mullica river or under the Kill von Kull, a different question might be presented. For, in such case, the essential feature on which the present case turns would be wholly lacking, viz., the necessity of a determination by the riparian commissioners of a question of fact on which their specific jurisdiction to make the particular grant depended. In such supposed case the lands so specified by the legislature would, in the language of the cases, "be withdrawn from sale." See cases cited, *post.*

Precisely what we are deciding therefore is that in the exercise of their general jurisdiction to grant lands under tidal waters it was in the present case necessary for the riparian commissioners to determine whether or not the lands in dispute were natural oyster beds and that the subsequent making of a grant thereof was in legal intendment tanta-

mount to a provisional adjudication that such lands did not possess such characteristics and that such adjudication, however erroneous in point of fact, and whether induced by error of judgment or by active or passive misrepresentation, cannot be called in question upon the trial of an action of ejectment by the production of testimony as to the actual character of said land.

The result thus reached by the consideration of the nature and incidents of grants made by our riparian commissioners accords with judicial decisions elsewhere regarding the grants or patents of the land departments of both the state and federal governments.

"A patent," said Mr. Justice Grier, in *United States* v. *Stone,* 2 *Wall.* 525, "is the highest evidence of title and is conclusive as against the government and all claiming under junior patents or titles until it is set aside or annulled by some judicial tribunal."

In *Johnson* v. *Towsley,* 13 *Wall.* 72, Mr. Justice Miller, speaking of the general land office, stated the general doctrine to be "that when the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties the decision of that tribunal within the scope of its authority is conclusive upon all others."

To the same effect is the language of the same judge in *Moore* v. *Robbins,* 6 *Otto* 530.

In *St. Louis Smelting Co.* v. *Kemp,* 14 *Otto* 636, Mr. Justice Field, speaking of a patent of the land office, said, touching a decision of the officers of that department:

"In that respect they exercise a judicial function, and therefore it has been held in various instances by this court that their judgment as to matters of fact, properly determinable by them is conclusive when brought to notice in a collateral proceeding. Their judgment in such cases is like that of other special tribunals upon matters within their exclusive jurisdiction, unassailable except by a direct proceeding for its correction or annullment."

This language is quoted with approval by Mr. Justice Brown in the case of *Noble* v. *Union River Logging Railway*

Co. already referred to. *Ard* v. *Brandon,* 39 *U. S.* (*L. ed.*) 525.

It is needless to continue citations to this same effect that might be multiplied to an almost indefinite extent.

There is, however, a class of cases that presents so strict an analogy to the one under consideration as to justify one further citation. The cases referred to arose under the act of congress granting swamp lands to the states, and the following quotations from the opinion of Mr. Justice Miller in *French* v. *Fyan,* 3 *Otto* 169, make it perfectly clear that the question in that case was the same as the one we are considering, viz., the legal effect of a determination by the proper public officer as to the characteristics of certain lands upon which the authority of such officer to make a grant of such lands depends. The similarity of the two cases both as to the legal question involved, and the manner in which it was raised in the collateral proceeding, appears from the opinion, the pertinent parts of which are as follows:

"An action of ejectment in this case was tried by the court below without a jury by agreement of the parties and the only finding made by the court was a general one in favor of the defendant on which judgment was rendered in bar of the action. The single question in this case is raised on the refusal of the court to receive oral testimony to impeach the validity of a patent issued by the United States to the State of Missouri for the land in question under the act of 1850, known as the swamp-land grant, the purpose being to show by such testimony that it was not in point of fact swamp land within the meaning of that act. The bill of exceptions shows that the land was certified in 1854 (under another act to a mesne grantor), and the plaintiff, by purchase, became vested with such title as this certificate gave. To overcome this *prima facie* case, defendant gave in evidence the patent issued to Missouri in 1857 under the Swamp Land act, and it was admitted that defendant had a regular chain of title under this patent. It was at this stage of the proceeding that the plaintiff offered to prove, in rebuttal, by witnesses, who had known the character of the land in dispute since

1849 till the time of the trial, that the land in dispute was not swamp and overflowed land made unfit thereby for cultivation, and that the greater part thereof is not, and never has been, since 1849, wet and unfit for cultivation. But the court ruled that since the defendant had introduced a patent from the United States to the state for said land under the act of September 28th, 1850, as swamp land, this concluded the question, and the court rejected the said parol testimony to which ruling of the court the plaintiff then and there excepted."

It is evident that the legal question thus presented is precisely the same as the one we are called upon to decide.

In affirming the judgment of the court below and approving its ruling in rejecting the proffered proof, Mr. Justice Miller said that the only question was "whether in an action at law in which these evidences of title came in conflict, parol testimony can be received to show that the land in controversy was never swamp land, and therefore the patent issued to the state under that act is void."

The analogous question before us is whether parol testimony can be received to show that the land in dispute was natural oyster beds, and hence the grant thereof made under our Riparian act was void.

In disposing of this question Justice Miller said: "We have so often commented in this court on the conclusive nature and effect of such a decision when made and evidenced by the issuance of a patent that we can do no better than to repeat what was said in the case of *Johnson* v. *Towsley,* 13 *Wall.* 72." The opinion then quotes liberally from the earlier decision and concludes: "We see nothing in the case before us to take it out of the operation of that rule, and we are of opinion that, in this action at law, it would be a departure from sound principle and contrary to well-considered judgments in this court and in others of high authority to permit the validity of the patent to the state to be submitted to the test of the verdict of a jury on such oral testimony as might be brought before it. * * * The principle we have laid down is in harmony with the system which governs the rela-

tions of the courts to the officers of the executive departments, especially those having charge of the public lands, as we have repeatedly decided, and we must abide by them."

There is no conflict between the views expressed by Mr. Justice Miller in this case and those expressed by him in *Reynolds* v. *Iron Silver Mining Co.,* 116 *U. S.* 687; *Doolan* v. *Carr,* 125 *Id.* 618; *Iron Silver Mining Co.* v. *Campbell,* 135 *Id.* 286.

All confusion between cases like the swamp-land grants and those in which placer mines and mineral lodes are involved is avoided by bearing in mind the obvious distinction between two things that are totally different from each other and two different states or conditions of the same thing. The distinction is fundamental. A mineral lode is a totally different thing from a placer mine and not a mere state or condition of such mine. A placer is "earth, sand or gravel containing valuable mineral in particles" (Webster), whereas a lode is "a solid vein of metal." They are two distinct things, not two different states of the same thing. Hence a reservation from sale of one of these distinct things leaves nothing to the determination of the state's sale agent. The same is true of saline or other discrete mineral or chemical deposits. Swamp land, on the contrary, is simply land that is too wet for cultivation, a characteristic by which it is distinguished from arable land, but it is none the less land; it is a mere state or condition of land the existence of which must of necessity be passed upon by the state's agency as an incident of its office.

So natural oyster beds are not a distinct and different thing from tidal lands; they are simply tidal lands possessed of certain qualities.

In view of this obvious distinction the opinions of Mr. Justice Miller do not conflict or leave the law as laid down by the Supreme Court of the United States in hopeless confusion.

Assuming, however, for the argument's sake, that such confusion exists, I am clear that we should adopt that rule of procedure (and it is a mere question of procedure) that will

give to our riparian grants stability and value rather than that which will detract from, if it will not destroy, such value by exposing them to constant collateral attack and invalidation by the verdict of juries of the vicinage. It is one thing to have the validity of a riparian grant judicially decided by the Court of Chancery and quite a different thing to have it successfully assailed before a jury of the vicinage. The value of such a grant depends upon the fact that it is not subject to such assault. "It is this unassailable character," said Mr. Justice Field in St. Louis Smelting Co. v. Kemp, "which gives it its chief, indeed its only value, as a means of quieting its possessor in the enjoyment of the lands it embraces. If intruders upon them could compel him, in every suit for possession, to establish the validity of the action of the land department and the correctness of its ruling upon matters submitted to it, the patent, instead of being a means of peace and security, would subject his rights to constant and ruinous litigation. He would recover one portion of his land if the jury were satisfied that the evidence produced justified the action of that department and lose another portion, the title whereto rests upon the same facts, because another jury came to a different conclusion. So his rights in different suits upon the same patent would be determined, not by its efficacy as a conveyance of the government, but according to the fluctuating prejudices of different jurymen or their varying capacities to weigh evidence."

Is this the procedure we should deliberately adopt? If our riparian grants are to be subject to such indirect attacks it is difficult to believe that any prudent man would purchase so insecure a tenure. Under such rule of interminable collateral attack, tidal lands, improved at no matter what expense, would revert to the state or pass to other hands whenever the allegation of a plaintiff in ejectment that there were natural oyster beds on such land obtained the concurrence of a jury of the vicinage.

Adherence to the fundamental rules of direct and collateral attack can alone save us from these untoward results.

Concurring, as I do, in the views expressed by Justice Mil-

ler in French *v.* Fyan, and finding them to be supported by the great preponderance of judicial decision, the question on which the present case turns would seem to be entirely at rest unless the courts of this state have laid down a contrary rule by which the grants of its public lands are at all times open to attack by parol proof in collateral proceedings.

I can find no indication in our reported decisions of any rule thus destructive of the value and validity of our state grants, nor has the industry of counsel directed our attention to any such adjudication.

The decision in *Polhemus* v. *Bateman,* 31 *Vroom* 163, and other cases based upon a false suggestion appearing on the face of the grant, have obviously no application to cases such as the present, in which there is no such suggestion, false or otherwise. Speculations as to the probable action of the courts when the non-ownership of the *ripa* is not suggested on the face of the grant, which can now result only in *dicta,* may well wait until such a case arises, which it is not likely to do as long as the present blank form of riparian grant is in use.

Whether or not the perpetual lease in *Fitzgerald* v. *Faunce,* 17 *Vroom* 536, 591, contained a false suggestion, cannot be gathered from the opinion of Mr. Justice Depue, who made no point of it, nor for that matter can it be definitely ascertained from the printed state of the case used in this court; it does, however, appear beyond question that the point was not deemed by the court to be raised in the case, and certainly it was not decided.

Of the cases cited from other states two, viz., *Averill* v. *Hull,* 37 *Conn.* 320, and *State* v. *Nash,* 62 *Id.* 47, were not cases of grants and are readily distinguishable from the present case. The remaining case (*Cook* v. *Raymond,* 66 *Id.* 285), if not distinguishable, is contrary to the weight of sound decision.

There is a line of cases also in California that seem to run counter to the doctrine established elsewhere, and that were on that account criticised and rejected by Mr. Justice Miller in the case of French *v.* Fyan.

3. It remains therefore only to consider whether the fact

that the plaintiff in error is the attorney-general of the state makes any difference in the rule as to collateral attack. From what has already been said it is evident that such rule is to be applied regardless of the official character of parties. When the attorney-general of the state, or, for that matter, when the state itself comes into its courts, the established rules of law are to be applied as in the case of other litigants. Moreover, the doctrines of collateral attack do not rest upon any consideration as to who are the parties to the proceeding at law, but solely upon considerations as to the nature and legal effect of the proceeding itself.

The language of Mr. Justice Depue, directing a verdict at the trial of an issue out of Chancery, in *American Dock and Improvement Co.* v. *Trustees of Public Schools,* 12 *Stew. Eq.* 409, is referred to as justifying the right of the state to maintain ejectment for lands granted under its authority. The language referred to is as follows:

"The state selected its officers as the persons to ascertain whether the conditions on which the grant was authorized existed and empowered them to make a deed in the name of and under the great seal of the state as evidence of the grant. The deed so authenticated executed the grant."

(So far the quotation is precisely what we are deciding.) "If there was any deception or fraud in procuring this grant relief is exclusively at the instance of the state either by *scire facias* to vacate the grant or by entry or by a subsequent grant of the same premises."

The argument, which is based wholly on the words "or by entry," proceeds upon the notion that the right of entry and the right to maintain ejectment are equivalent terms. As between private parties so they are, but Mr. Justice Depue was speaking of entry by the sovereign, as appears from the cases cited by him in its support, all of which show that entry by the state must be pursuant to legislative authority that is the equivalent of an adjudication of forfeiture. The cases thus cited by him are: *Field* v. *Seabury,* 19 *How.* 323; *White* v. *Burnley,* 20 *Id.* 235; *Spencer* v. *Lapsley, Id.* 264; *Farnsworth* v. *M. & P. R. R. Co.,* 92 *U. S.* 49; *Schulenberg*

v. *Harriman*, 21 *Wall.* 44. No one of which affords the slightest support for the argument that the attorney-general of a state may (without more) maintain ejectment for lands granted by the proper state officers; on the contrary, they all show the rule to be otherwise. In the case last cited (Schulenberg *v.* Harriman) Mr. Justice Field expressly states: "If the grant be a public one it must be asserted by judicial proceedings authorized by law, finding the fact of forfeiture and adjudging the restoration of the estate on that ground, or there must be some legislative assertion of ownership of the property for breach of the condition such as an act directing the possession and appropriation of the property, or that it was offered for sale or settlement. At common law the sovereign could not make an entry in person, and therefore an office found was necessary to determine the state. But as was said by this court in a late case the mode of asserting or of resuming the forfeited grant is subject to the legislative authority of the government; it may be after judicial investigation or by taking possession directly under the authority of the government without these preliminary proceedings. In the present case no action has been taken either by legislation or judicial proceedings to enforce the forfeiture of the estate granted by the acts of 1856 and 1864."

The circumstance that this language was used with respect to entry after condition broken does not at all weaken its force for the purposes for which it is cited, viz., that the attorney-general may not merely *ex-officio* maintain this action of ejectment.

The necessity of an office found related to the form of the action, *i. e., scire facias,* and hence, has no application to a bill in Chancery by the state which, in this country at least, is its modern substitute. The need of an office found before the issuance of a *scire facias* is stated in 8 *Bac. Abr.* 609, to be "for that a *sci. fa.* is a judicial writ and ought to be founded on a record," but touching the jurisdiction of Chancery, the author adds, "the patent is a record in Chancery upon which this *sci. fa.* issued, and it is a sufficient record whereon to found it." And Blackstone, speaking of this jurisdiction of

Chancery, says that it is a common law and not an equitable one, and is "much more ancient than the court of equity." "Its jurisdiction," Blackstone says, "is to hold plea upon a *scire facias* to repeal and cancel the king's letters patent when made against law or upon untrue suggestions." The learned commentator even derives the name of Chancery from this jurisdiction of the Chancellor of "cancelling the king's letters patent when granted contrary to law which," he adds, "is the highest point of his jurisdiction." 3 *Bl. Com.* 45, 48.

Speaking of *scire facias,* the same author says: "Where the crown hath unadvisedly granted anything by letters patent which ought not to be granted, * * * the remedy to repeal the patent is by a writ of *scire facias* in Chancery." 3 *Bl. Com.* 260. *"Scire Facias," Bouv. (Rawle's Rev.)* 960.

The jurisdiction of Chancery in this country to proceed by bill filed in like cases is stated by Mr. Justice Lamar in *United States* v. *Beebe,* 127 *U. S.* 338, in these words: "It may now be accepted as settled that the United States can properly proceed by bill in equity to a judicial decree of nullity and an order of cancellation of a patent issued in mistake or obtained by fraud where the government has a direct interest or is under an obligation (to the public) respecting the relief invoked," citing the opinion of Mr. Justice Miller in *United States* v. *San Jacinto Tin Co.,* 125 *Id.* 273.

This language was quoted with approval by Mr. Justice Brewer in *San Pedro, &c.,* v. *United States,* 146 *U. S.* 120, and has been followed and applied to grants made without lawful authority by governmental agencies in numerous cases many of which are cited in the notes in 26 *Am. & Eng. Encycl. L.* 397.

The jurisdiction of Chancery upon a bill filed on behalf of the state to annul a grant of state lands made by a state agency or department without lawful authority, does not admit of the slightest doubt.

It is a pertinent circumstance that in respect to the very grant that is now before us this jurisdiction by direct attack was not only pointed out to the attacking parties, but was in

effect tendered to them by Vice Chancellor Leaming, when denying their right of collateral attack, in the case of *Sooy Oyster Co.* v. *Gaskill,* 69 *Atl. Rep.* 1084.

The decision I have reached renders it unnecessary for me to consider whether the supplement of March 6th, 1888, was repealed by the later supplement of March 20th, 1891. I have *arguendo* treated the act of 1888 as still in force as the hypothesis most favorable to plaintiff in error, who, if such act be deemed to be repealed, has no standing whatsoever.

Approving, as I do the rulings of the trial court, the judgment brought up by this writ of error should be affirmed.

I am requested by the Chancellor, the Chief Justice, Justices Reed, Trenchard, Parker, Voorhees and Judge Vredenburgh, to say that they concur in the foregoing views.

SWAYZE, J. (reversing). The learned trial judge overruled the offer on behalf of the attorney-general to show the character of the lands under water covered by the defendant's grant. He evidently relied upon the authority of the decision by Vice Chancellor Leaming in 69 *Atl. Rep.* 1084. The object of the offer was to show that the land comprised within the grant was natural oyster beds, which the riparian commission was forbidden by the act of March 6th, 1888, to convey. The effect of this ruling and the direction of a verdict for the defendant which followed was to establish the validity of the grant for the whole of the premises covered thereby notwithstanding the legislative prohibition. Such a result at once challenges attention. The importance of the case to the interests of the state can hardly be overestimated, since it affects not only valuable lands under tidewater which the state for many years has been sedulous to improve and preserve for the benefit of the public in the supply of an important article of food, but it affects the power of the legislature to control its own agents by its public statutes. The decision goes much deeper than the mere question of procedure. It may be of little consequence whether the state is to proceed by bill in Chancery to annul the grant or by suit in ejectment to recover possession, since we are bound to as-

sume that the Court of Chancery in the former case and a jury of the vicinage in the latter case would each do exact and even-handed justice. The difficulty is that if the grant was within the jurisdiction of the riparian commission, it would be most inequitable to permit the state hereafter in any proceeding by bill in Chancery, or otherwise, to take away the land granted after it had been improved at great expense by the grantees. The courts do not, in such cases where the administrative officers had jurisdiction, review their determination of a question of fact, but interfere only in cases of mistake, fraud, deceit, or misconstruction of the law. *Johnson* v. *Towsley,* 13 *Wall.* 72; *Maxwell Land Grant Case,* 121 *U. S.* 325; *United States* v. *Iron Silver Mining Co.,* 128 *Id.* 673.

If the only question is one of fact which the administrative officers had jurisdiction to pass upon, their decision is final and binding upon a direct attack in equity as well as in a collateral attack. That is the only fair result, for the state ought not to be allowed to repudiate the decision of the very tribunal to which it has referred the question, unless for the causes recognized in the cases above cited. Of these causes, fraud and deception require no further definition. Mistake is such a mistake as is the proper subject of equitable relief, not a mere error in the determination of a fact, but such a mistake as leads to a conveyance of something which the state did not mean to convey and the grantee did not mean to buy. It is not contended that there is in this case any misconstruction of law. The only question is one of fact whether any of the land was natural oyster beds; if the riparian commission was entrusted with the power to decide that question, the land is lost to the state.

The case moreover is not one which involves the annulling of the grant. The riparian commission certainly has the power to grant lands under tidewater which are not natural oyster beds. This grant, like any other, may be entirely valid as to a portion of the land granted, but may not operate to convey such portion as is natural oyster beds. In such a case, the grant could not be annulled, and it is not the func-

tion of a suit in Chancery to determine the boundaries of a grant. The boundaries are to be determined as any other question of boundaries is determined, ordinarily by the verdict of a jury. The grant, if by mistake it conveys land which was not meant to be conveyed, is to be rectified by a bill in Chancery for reformation. Such a proceeding is quite inconsistent with the theory that the question of fact whether any of the land was natural oyster beds had been adjudicated by the riparian commission adversely to the claim of the state; for if that question had been before them and decided, it could not be contended that by their subsequent grant they did not mean to include the land, the character of which had been thus determined. It is incorrect to say that in this proceeding the attorney-general sought to have a grant declared void. He claimed the whole of the land, not because the grant was invalid, but because it was inoperative, just as if it had conveyed land which the state had previously granted to others.

It was permissible for the jury to render a verdict for the state for a portion of the land only. *Gen. Stat., p.* 1288, *pl.* 41. If the state was entitled to recover any portion of the land for which it sued, the direction of the verdict for the defendant as to the whole tract was improper.

I am aware of the importance of sustaining the validity of riparian grants when legally made, but it is equally important to maintain the rights of the state as against individuals who seek to acquire lands contrary to law. We pursue the safer course when we decide such cases in accordance with the logical consequences of established legal principles without regard to those questions of public policy which may well affect legislative action, but ought not to control the action of the courts. If I entertained the fear of the result of jury trials which is sometimes expressed, a fear which hardly comports with the long-continued use of the jury in cases involving the title to land, I should hesitate to say that the court was justified in adopting a rule which would substitute another tribunal. It has always been held that the citizen has a constitutional right to submit the title to his land to the

verdict of a jury, and the doubt which has been felt as to the power of the legislature to confer upon the Court of Chancery jurisdiction to remove a cloud upon title, the limitations upon the power of the court in those cases and the express reservation of the right to take the verdict of a jury, combine to warn us how careful the law has been to preserve the prerogatives of the jury in cases where the title to land is involved. The care thus evinced is persuasive evidence that upon the whole substantial justice has been done by juries. The occasional miscarriages of justice have been redressed by the corrective power of the courts, and it may be a debatable question whether such miscarriages have been more frequent than they would have been if the decision had been as in some countries committed to the court alone. The intent of the legislature is plain. At the beginning of our legislation as to riparian grants by section 12 of the act of March 31st, 1869 (*Gen. Stat., p. 2789, pl.* 19), the commissioners were authorized to proceed in the name of the state by ejectment or otherwise against trespassers upon or occupants of lands of the state under tidewater. No question has been raised by plea or in the argument as to the right of the state to maintain ejectment or to the form in which this action is brought. It is irregular to entitle the cause in the name of the attorney-general at the instance of nominal plaintiffs, but the declaration avers that the action is brought for the state, and concludes by the averment that the defendant wrongfully deprives the state of the possession; the plea is that the defendant is not guilty of the injury whereof the state hath complained. In substance, it is an action of ejectment by the state, and counsel were right in so treating it; the mere formal introduction of the declaration is amendable. What, then, is the situation which the case presents? It is recognized that even after a grant under the great seal, the state may assert rights not only by bill in Chancery to annul the grant, but by entry upon the land. It was so held by one of our most learned judges, the late Chief Justice Depue, in the great case of *American Dock and Improvement Co.* v. *Trustees of Public Schools,* 12 *Stew. Eq.* 409 (at *p.* 418). What

he said was in form only a charge to a jury, but in fact it was an opinion disposing of the case, and prepared with a care and thoroughness commensurate with the magnitude of the interests involved, and the pains that great judge was accustomed to take. At common law the sovereign could not make an entry in person, but as was said by Mr. Justice Nelson in *United States* v. *Repentigny,* 5 *Wall.* 211, 268 : "The mode of asserting or of assuming the forfeited grant is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly under the authority of the government without these preliminary proceedings."

At common law the king could not maintain ejectment because by reason of his legal ubiquity he could not be dispossessed. 3 *Bl. Com.* 257. The difficulties in the way of entry and of ejectment were similar. When our legislature by section 12 of the act of 1869 authorized proceedings "by ejectment, or otherwise, against persons and corporations trespassing upon or occupying the lands of the state under water," it evidently meant to do away with the technical difficulties interposed by the common law. The words "or otherwise" can hardly refer to any proceeding against occupants as distinguished from trespassers unless by way of entry. Occupants, if not trespassers, are rightfully in possession, and the proceeding by the state must be in the nature of an entry to terminate that right. The actions provided for by this section were evidently common-law actions, since the act provides that the charges and counsel fees shall be taxed by the Chief Justice, not by the Chancellor. This statute itself is a sufficient answer to the suggestion that the only remedy of the state is by bill in Chancery. We may, in the absence of plea or suggestions to the contrary, assume that an action of ejectment instituted by the attorney-general for the protection of the rights of the state has been duly authorized; if not, that is a question between the riparian commission and the attorney-general, and want of authority to sue would afford no justification to the defendant in an action by the state if he is trespassing upon or occupying its lands. The

real question is, therefore, whether it was competent for the attorney-general in the present case to show that any part of the lands belonged to the state, for if section 12 was meant to provide a method of testing the title, in addition to the method by bill in Chancery, and an equivalent for the right of entry by a private individual, it would be no answer to produce the grant under the great seal; that is the very thing to be questioned.

In the determination of this question of title, the state made its *prima facie* case by proving that the lands were under tidewater. Such lands belong to the state unless they have been conveyed away. In answer to this, the defendant made a *prima facie* case for itself by producing the grant from the riparian commission. Such a grant is valid as far as affects lands under tidewater that are not natural oyster beds. The application of that grant to the *locus in quo* depends, however, upon the authority of the riparian commissioners. It is not a question of attacking a grant under the great seal, but of locating that grant upon the ground. If in so locating it, part of the land is found to be natural oyster beds, that part cannot pass to the grantee because the legislature has expressly forbidden the commission to make such a grant, and, so far as they exceed their powers, their act is not the act of the state at all. No one can contend that if the riparian commission made two grants which overlapped, either one on its face would be conclusive; it would be a question for a jury which grant was the earlier. It is true that a controversy of that kind would arise between private individuals, but can there be any difference in legal principle between the case of land previously conveyed which the state is therefore without power to grant, and the case of land which the legislature has forbidden the riparian commission to convey? As Mr. Justice Van Syckel said in *Polhemus* v. *Bateman,* 31 *Vroom* 163:

"It is well settled that officers entrusted with power of sale exercise a naked power, and no title passes unless the conditions exist upon which the exercise of the power depends."

He adds:

"A grant which, by the terms of the Riparian act, the riparian commission were disabled to make, and which, by the express language of the conveyance executed by them, they declared they did not intend to make, passed no title to the grantee, and could not have the effect to make the act of Polhemus a trespass."

It is true that in that case the grant itself embodied the limitation of the statute, but Mr. Justice Depue, also speaking for this court, had previously said, in *Fitzgerald* v. *Faunce,* 17 *Vroom* 536 (at *p.* 594):

"Under the act of 1871, no one but a riparian owner can apply, and the grant by the commissioners to anyone else would be *ultra vires.*"

If a grant which the commissioners were empowered to make to a riparian owner is *ultra vires,* when the grantee is not in fact the riparian owner, much more must their act be *ultra vires* when it attempts to convey land which the commissioners were expressly forbidden to convey. No machinery is provided by which the commission can determine either the fact of the ownership of the *ripa* or the fact of the existence and location of natural oyster beds. In truth, as I shall show, the latter fact has been left to the determination of another tribunal. The riparian commission may well make a general grant, and for the state's protection, rely upon the express language of the act of 1888, limiting its power, of which everyone must take notice. The fact that the great seal of the state is physically affixed cannot enlarge the grant. It is of no effect because affixed by the riparian commission, so far as they exceed the power given them by the legislature.

The grantee taking the title from the riparian commissioners is, of course, chargeable with notice of the powers and the limitations upon the powers of the commissioners imposed by the public acts of the legislature, and if the act is unauthorized, he is conclusively presumed to know the fact, and acts at his peril, just as anyone who chooses to deal with an agent, with knowledge that the agent is transcending his powers.

The error assigned is the exclusion of all evidence as to the character of the land conveyed. We must assume that the state could have proved that all the land was natural oyster beds and within the statutory prohibition. If this is so, there was no jurisdiction in the commissioners. If it is not so, it was permissible for the state to show the character of the land in order to ascertain the extent of the conveyance, precisely as in the cases of the mining grants at Leadville from the United States government, to be hereafter cited, it was permissible to show that the grantee under a placer patent knew of the existence of lodes and veins within its boundaries so that his conveyance from the government was less extensive than it purported to be on its face. I have likened the case of a grant of natural oyster beds, forbidden to be conveyed, to the case of lands already conveyed to another, where the state has no title. The comparison is not original with me. In 1815, Chief Justice Marshall, in delivering the opinion in *Polk* v. *Wendal,* 9 *Cranch* 87, said that the question was: "Is it in any, and if in any, in what cases, allowable in an ejectment to impeach a grant from the state, for causes anterior to its being issued?" He then held that it would be unreasonable to avoid a grant for irregularities in the conduct of public officers appointed to supervise the matter, and commented upon the greater advantage of a court of equity where the question was of essentials rather than of mere irregularities, and added: "But there are cases in which a grant is absolutely void; as where the state has no title to the thing granted; or where the officer had no authority to issue the grant. In such cases the validity of the grant is *necessarily examinable at law.*"

Numerous cases have followed Polk *v.* Wendal. As recently as 1896, in Burfenning *v.* Chicago, St. Paul, &c., Railway, Mr. Justice Brewer said: "It has undoubtedly been affirmed over and over again that in the administration of the public land system of the United States, questions of fact are for the consideration and judgment of the land department, and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land

or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony; and it cannot be doubted that the decision of the land department, one way or the other, in reference to these questions, is conclusive and not open to relitigation in the courts, except in those cases of fraud, &c., which permit any determination to be. re-examined. But it is also equally true that when by act of congress a tract of land has been reserved from homestead and pre-emption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or dedication, although culminating in a patent, transfer no title and may be challenged in an action at law. *In other words, the action of the land department cannot override the expressed will of congress or convey away public lands in disregard or defiance thereof.*"

So, in *Noble* v. *Union River Logging Co.*, 147 U. S. 165, Mr. Justice Brown said (at *p.* 173) :

"It is true that in every proceeding of a judicial nature there are one or more facts which are strictly jurisdictional, the existence of which is necessary to the validity of the proceedings, and without which the act of the court is a mere nullity."

He gives as an example of such a jurisdictional fact, without which the act is a mere nullity, the case where "the land department issues a patent for land which has already been reserved or granted to another person," in which case he adds, "The act is not voidable merely, but void." After distinguishing between such jurisdictional facts and those which he calls *quasi*-jurisdictional, he continues:

"This distinction has been taken in a large number of cases in this court in which the validity of land patents has been attacked collaterally, and it has always been held that the existence of lands *subject to be patented* was the only necessary prerequisite to a valid patent. In the one class of cases it is held that if the land attempted to be patented had been reserved, or was at the time no part of the public domain, the land department had no jurisdiction over it and no power or authority to dispose of it. In such cases its action in cer-

tifying the lands under a railroad grant or in issuing a patent is not merely irregular, but absolutely void, and may be shown to be so in any collateral proceeding."

There is a class of cases of which *French* v. *Fyan,* 93 *U. S.* 169, is a good example, where the determination of the land office as to the character of the land—in that case swamp land or not—was held final. In all these cases, as far as I know, it will be found that the land covered by the patent was land which the land office had power to grant, and the only difference was a difference of procedure, of the *method* by which the title of the government was to be conveyed, not of the *right* of the land commissioner to convey. In other cases, where the land was not subject to disposition, the result was different. I need refer only to cases which have a more or less close analogy to the case at bar.

In *Morton* v. *Nebraska,* 21 *Wall.* 660, Morton and others, in an action of ejectment, claimed lands by virtue of patents under the Military Bounty Land act. The State of Nebraska claimed the lands under acts of congress reserving saline lands from sale. It was held that the title of the state must prevail. Mr. Justice Davis said:

"It does not strengthen the case of the plaintiffs that they obtained the certificates of entry, and that patents were subsequently issued on these certificates. It has been repeatedly decided by this court that patents for lands which have been previously granted, reserved from sale, or appropriated, are void. The executive officers had no authority to issue a patent for the lands in controversy, because they were not subject to entry, having been previously reserved, and this want of power may be proved by a defendant in an action at law."

In that case the lands in question had been noted on the field books as saline, but these notes had not been transmitted to the register's general plats. The case turned upon the fact that the land was not only saline but known to be such, and the court reserved the question what effect the statute reserving such lands might have on salines hidden in the earth.

In *Reynolds* v. *Iron Silver Mining Co.,* 116 *U. S.* 687, the mining company claimed under a patent for placer mines. The defendant asserted a right under what are called lode claims. The court held that the act of congress provided for three classes of cases:

1. When the applicant for a placer patent is at the time in possession of a vein or lode included within the boundaries of his placer claim he shall state that fact, and on payment of the sum required for a vein claim and twenty-five feet on each side of it at $5 per acre and $2.50 for the remainder of the placer claim, his patent shall cover both.

2. Where no such vein or lode is known to exist at the time the patent is applied for, the patent for a placer claim shall carry all valuable mineral and other deposits which may be found within the boundaries thereof.

3. But in cases where the applicant for the placer patent is not in possession of such lode or vein within the boundaries of his claim, but such a vein is known to exist, and it is not referred to or mentioned in the claim or patent, then the application shall be construed as a conclusive declaration that the claimant of the placer mine has no right to the possession of the vein or lode claim.

"It is this latter class of cases," says Mr. Justice Miller, "to which the one before us belongs," and it was held that the placer patent conferred no title, and that the mining company, which sought to recover possession in an action at law, could not succeed against the defendants who were working the lode, even though they were mere trespassers. The importance of this decision in the present case is that the effect of the placer patent was made to depend upon a matter resting purely in parol, as to whether or not at the time the application was made for the placer patent a lode or vein was known to exist within its bounds. The case is, therefore, authority for determining by the verdict of a jury in an action at law a fact resting purely upon parol evidence, and operating to limit the general language of the patent and to define the extent of the property conveyed.

In *Doolan* v. *Carr*, 125 *U. S.* 618, Carr brought ejectment claiming title under a patent from the United States to the Central Pacific Railroad Company and a subsequent deed from the railroad company to himself. The defendants offered to show that this patent was void, to which the plaintiff objected upon the ground that the patent could not be collaterally attacked, that it could be attacked by bill in equity only, that it was conclusive evidence in the pending action that the legal title of the lands therein described was granted and transferred by the United States to the grantee named in the patent. The court sustained the objection, and on writ of error the judgment was reversed for this error. Mr. Justice Miller said:

"There is no question as to the principle that where the officers of the government have issued a patent in due form of law which, on its face, is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law as distinguished from suits in equity, subject, however, at all times, to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority, if the land which they purported to convey had never been within their control, *or had been withdrawn from that control at the time they undertook to exercise such authority,* then their act was void—void for want of power in them to act on the subject-matter of the patent, not merely voidable, in which latter case, if the circumstances justified such a decree, a direct proceeding with proper averments and evidence would be required to establish it was voidable, and should, therefore, be avoided. The distinction is a manifest one, although the circumstances that enter into it are not always easily defined. It is, nevertheless, a clear distinction established by law, and it has been often asserted in this court that even a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue."

Mr. Justice Miller's opinion is valuable for the reason that it contains a review of prior decisions in point. It is true that he refused to decide how far parol evidence could be received in an action at law for the purpose of impeaching the patent, holding that the evidence in the case was entirely documentary. This could be true only in a qualified sense, since a part of the evidence was necessarily parol testimony to identify the land and the boundaries. Chief Justice Waite, in dissenting, expressly said that the ground of his dissent was not that in a proper case the validity of a patent of the United States for the conveyance of land might not be attacked in a suit at law by proving it was issued without the requisite authority, but that this is not a proper case for the application of that rule. He thought that such proof could only be made by one who held a right at law or in equity, which is prior in time to that of the patentee, or by one who claimed under the United States by a subsequent grant or some authorized recognition of title; but even on the view which he took, the State of New Jersey, in the present case, would have a right to prove the want of authority of the riparian commissioners to issue the patent in question.

In *Iron Silver Mining Co.* v. *Campbell,* 135 *U. S.* 286, the controversy arose in an action in the nature of ejectment between the owner of a patent for a placer mine and the owner of a patent for a lode within the boundaries of the land covered by the placer patent. The placer patent was prior in point of time, but the trial court held that it must be conclusively presumed from the fact that the lode patent had been subsequently issued that the facts necessary to make it a valid grant had been ascertained by the land office and could not be questioned in an action of ejectment. The essential fact was whether the existence of the lode was known to the patentees of the placer patent at the time they acquired the same, a fact resting purely in parol; but the Supreme Court of the United States held that the trial court was in error, and that, in order to sustain the validity of the lode patent, it was necessary for the claimant thereunder to establish the existence of the lode and the knowledge thereof

by the patentee under the elder patent at the time he acquired the same. It would be difficult to find a case where the validity of a patent rested more thoroughly upon the verdict of a jury rendered upon parol evidence as to a fact of which there could be no record. The case is also interesting because it distinguishes French v. Fyan, relied upon in the present case, upon the ground that in that case the secretary had certified that the lands in controversy were swamp lands. In the present case there is nothing to show whether or not the riparian commission considered the question whether the land in question was natural oyster beds.

The litigation in these cases of the Iron Silver Mining Company was important and prolonged, since it involved grants at Leadville. The matter came before the court again in *Iron Silver Co.* v. *Mike & Starr Gold and Silver Mining Co.*, 143 U. S. 394, which was twice argued and held for mature consideration, the contention being that a known vein must be a located vein or lode, but it was held that this was not correct, and the matter was treated as a question of fact to be determined upon parol evidence by a jury. The importance of this case to the present lies in the fact that it shows clearly that lands may be reserved from sale by a general description, and that a specific description by metes and bounds is not necessary. Just as known lodes or veins were reserved from grant under a placer patent, leaving the fact that they were known as well as their exact boundaries to be determined by the verdict of a jury, so natural oyster beds are reserved from the riparian lands which the commissioners are authorized to convey.

In *Davis* v. *Weibbold*, 139 U. S. 507, which was an action for the possession of mining land, the plaintiff Weibbold claimed title under a patent for mineral land. The defence justified under a patent prior in date for a town site which, pursuant to law, exempted from the grant any mine of gold, silver, cinnabar or copper, and any valid mining claim or possession held under existing laws of congress. If the mineral rights claimed by the plaintiff were within this exception, his title was good, and it was sought to sustain it on the ground

that the land office in issuing the patent must have determined that the facts existed which would make the patent valid. The Supreme Court held, reversing the trial court, that by a proper construction of the defendant's patent, only such lands were excepted as were at the time of the grant known to be so valuable for their minerals as to justify expenditure for their extraction. It said that the question was not whether there were valuable minerals at the time that the patent was issued, but whether such minerals were known to exist within the premises at the date of the town site patent to the probate judge.

"The plaintiff not having offered any proof upon this point, but having relied upon the fact as a matter of presumption merely, the defendant should have been permitted to establish the negative of it. The absence of any proceedings required by law or the custom of the mining district to initiate a right to a mining claim which he might perhaps have shown would have been very persuasive that no mine was known to exist."

The case, therefore, made the validity of a patent issued by the land office depend upon a matter resting entirely upon parol evidence as to whether minerals were known to exist at the time the town site patent was granted. The court treated the mining patent as affording a presumption that the existence of such minerals was known, subject to be rebutted by proof on the part of the claimant under the town site patent. The case is important, because the patent which was pronounced inoperative contained nothing on its face to indicate its defect. The defect arose out of the fact that the minerals in question were held not to be within the reservation of the prior town site patent, and what that reservation was, depended upon no record, but upon parol testimony entirely. At first blush it might appear as if the ruling of the court in this case upon the effect of the town site patent conflicted with the rule that lands reserved from sale do not pass by the patent. An examination of the opinion, however, shows clearly that such is not the case, for the court held that while the language of the exception in the town site patent

would seem on first impression to constitute a reservation of such mines in the land sold and all mining claims on them to the United States, that such was not the necessary meaning, since, in strictness, the words imported only that the provisions by which title to the land in such town sites is transferred shall not be the means of passing a title also to mines of gold, silver, &c. And this explanation by the court distinguishes also its subsequent decision in *Barden* v. *Northern Pacific Railroad Co.,* 154 *U. S.* 288 (at *pp.* 323, 324). In that case all that the court decided was that the congressional grant of lands to the Northern Pacific railroad, which reserved mineral lands, reserved not only lands which were known to be mineral at the time, but those which were subsequently discovered to be such. In order to meet the argument that that construction of the grant made the title uncertain, the court said, *arguendo,* that the title would be made certain when the patent was issued, but this conclusion of the court rested upon the view suggested in Davis *v.* Weibbold, that there was power in the land office to issue a patent even for mineral lands, and that it was only the procedure which was different. I do not, of course, question that when a patent is once issued, or a riparian grant is once made, defects in procedure cannot be questioned collaterally.

All the cases treat lands reserved from sale and lands previously conveyed as coming within the same class. The law is thus summed up in *St. Louis Smelting and Refining Co.* v. *Kemp,* 104 *U. S.* 636. Mr. Justice Field, while maintaining the conclusive presumption attending a patent for lands, used the following language:

"Of course, when we speak of the conclusive presumptions attending a patent for lands we assume it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted con-

veyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would, in that event, be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind disclosing a want of jurisdiction may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act."

And again: "The doctrine declared in these cases as to the presumptions attending a patent has been uniformly followed by this court. The exceptions mentioned have also been regarded as sound, although from the general language used, some of them may require explanation to understand fully their import. If the patent, according to the doctrine, be absolutely void on its face it may be collaterally impeached in a court of law. *It is seldom, however, that the recitals of a patent will nullify its granting clause, as, for instance, that the land which it purports to convey is reserved from sale.* Of course, should such inconsistency appear, the grant would fail. Something more, however, than an apparent contradiction in its terms is meant when we speak of a patent being void on its face. It is meant that the patent is seen to be invalid, *either when read in the light of existing law, or by reason of what the court must take judicial notice of, as, for instance, that the land is reserved by statute from sale or otherwise appropriated, or that the patent is for an unauthorized amount, or is executed by officers who are not entrusted by law with the power to issue grants of portions of the public domain."*

For the same view see *Lake Superior Ship Canal, &c., Co.* v. *Cunningham,* 155 *U. S.* 354 (at *p.* 373), and *Burfenning* v. *Chicago, St. Paul, &c., Railway Co.,* 163 *Id.* 321.

In *Mahn* v. *Harwood,* 112 *U. S.* 354, which was a suit to recover damages alleged to have resulted from the infringement of letters patent, and therefore a collateral attack on the patent, Mr. Justice Bradley said: "Where it is evident that

the commissioner, under a misconception of the law, has exceeded his authority in granting or reissuing a patent, there is no sound principle to prevent a party sued for this infringement from availing himself of the illegality, independently of any statutory permission so to do. This is constantly done in land cases, where patents have been issued which the land officers had no authority to issue, as where the lands have been previously granted, reserved from sale, or appropriated to other uses."

These cases justify the statement that a grant by the riparian commission of lands which they have been expressly forbidden by the legislature to sell conveys no title, and is subject even to collateral attack, and that in a proper case this attack may be made by parol proof of the actual character of the lands.

It does not help us much to say that the action of the riparian commission cannot be questioned as to matters of fact within their jurisdiction. The important question is what fact was essential in order that the commission might have jurisdiction. No better description of such jurisdictional fact can be had than has been given in the cases above cited and all agree that if the legislative department has reserved the land from sale, the administrative department of the government has no power over the land so reserved. None of the cases hold that this reservation must be of a particular tract described by metes and bounds or identified by specific name. Morton v. Nebraska, as far as it goes, seems to indicate the contrary, and clearly the Leadville mining cases are authority for the assertion that such definite description is unnecessary. A lode of mineral in the earth may be marked when it is finally explored or worked with all its spurs, dips and angles, but until that is done, it is at least as hard to locate definitely as a natural oyster bed. Natural oyster beds, as the term is used in our legislation, seems to mean something different from land under tidewater suitable for growing oysters. From the beginning of legislation on the subject of oysters in 1846 the legislature has constantly made reference to natural oyster beds as something well known and distinct from tidal lands

suitable for the planting of oysters. The original act, by section 14 (*Gen. Stat., p.* 808), authorized the owners of flats and coves along the shore to stake out land and plant oysters, provided they did not include any natural oyster beds always covered with water beyond low-water mark, and section 20 prohibited, under a penalty, the removal of old shells from any natural oyster banks or beds. The amendment of 1890 (*Gen. Stat., p.* 813, *pl.* 43) authorized the staking out of ground and the planting of oysters on flats or in coves upon which there had not been theretofore any natural oyster beds. The supplement of 1891 (*Gen. Stat., p.* 813, *pl.* 44a) confirmed the rights of persons using or occupying grounds under tidewater for the planting or cultivation of oysters, "said grounds not being natural clam grounds or natural oyster seed beds;" it further declared (*Gen. Stat., p.* 814, *pl.* 44c) that any person who should plant oysters upon any of the natural beds should be deemed a trespasser and such planted oysters should be forfeited to the public. Surely the legislature would not have decreed a forfeiture unless the natural beds were of such a character that the planter could not be mistaken, and trespass innocently.

Section 8 of the act of 1882 (*Gen. Stat., p.* 823, *pl.* 95), as to Maurice river cove and Delaware bay, makes it a misdemeanor, punishable by imprisonment, to take oysters from natural oyster beds for the purpose of planting in the waters of any other state. It would be most unreasonable to punish such an act as a crime unless the natural oyster beds were of so defined a character that the offender must know that he was violating the statute.

The act of 1883 as to Maurice river cove and Delaware bay (*Gen. Stat., p.* 824, *pl.* 104), the supplements of March 16th, 1893 (*Gen. Stat., p.* 830, *pl.* 129), of April 5th, 1893 (*Gen. Stat., p.* 830, *pl.* 131), contain similar recognition of natural oyster beds. The Ocean County act of 1886 for the first time makes a distinction between natural oyster beds in general and those "now known and recognized," a distinction which suggests the provisions of the United States statutes as to known mineral lodes in the cases already cited.

The act of April 4th, 1893 (*Gen. Stat., p.* 833, *pl.* 148, *ff.*), for the first time provides for an oyster commission. By its first section the natural oyster beds of the state are divided into seven districts, of which District No. 5 is "the bays and waters of Atlantic county." It may be contended with some reason that the effect of this act was to declare all the bays and waters of Atlantic county to be natural oyster beds, and if the only meaning of the expression was to designate a quality or characteristic of the land, I should think this the proper construction; it is, of course, not the proper construction, if my view is correct, that natural oyster beds are a definite portion of the land under water sufficiently recognizable to justify the legislature in making it a crime to remove oysters therefrom. My view is supported by section 3 of the act (*Gen. Stat., p.* 833, *pl.* 150), which makes it the duty of the commissioners to make a careful inspection of the natural oyster grounds in their respective districts and to cause a supply of shells to be spread on the ground. The commissioners could hardly make this careful inspection unless the natural oyster beds were defined with some approach to accuracy, perhaps as close an approach as would be possible in the case of a mineral lode with its veins and all the spurs, dips and angles. If such natural oyster beds were sufficiently defined to be recognized by the commissioners, they could be recognized with equal facility by the purchaser of a riparian grant.

Similar provisions are found in the act of May 17th, 1894. *Gen. Stat., p.* 835, *pl.* 161, and *p.* 836, *pl.* 166.

New districts were created by the act of 1896. *Pamph. L., p.* 186. The waters of Atlantic county were still included but divided between two districts. With the act of 1899, relating to Delaware bay and Maurice river cove, a new policy began and leases by the state oyster commission were authorized, but certain named oyster beds and any other commonly known natural oyster bed in Delaware bay or Maurice river cove, or the creeks and rivers emptying therein, were reserved from the power to lease. The policy of leasing was extended to Ocean county in 1902. *Pamph. L., p.* 170. The act was

not extended to Atlantic county until 1905, which was after the grant in the present case was made. Under such legislation the oyster grounds subject to lease by the oyster commission must necessarily be withdrawn from the jurisdiction of the riparian commission. The importance of the legislation in its bearing on the present grant lies in the fact that it shows a consistent purpose on the part of the legislature to separate lands under tidewater into two classes, those which are natural oyster beds and those which are not natural oyster beds. Since 1888 the first class have been withdrawn from the power of the riparian commission.

No one would assert that if the legislature had forbidden the commission to convey lands under the waters of the Mullica river, the commissioners could convey any such lands and have their conveyance free from collateral attack in an action of ejectment. But such a description would be only a little, if at all, more definite than the exception of natural oyster beds. It would certainly be necessary to determine where the Mullica river is, and while, no doubt, a natural boundary of that kind generally has a definite location at any particular point of time, not only may the river shift its bed (some rivers shift very far and very often) so that the determination of its location at the time of the grant would rest in parol evidence, but the bounds of the river itself may be indefinite. We have only to recall the controversy lasting for so many years between the colony of New Jersey and the colony of New York as to the proper location of the river Delaware at forty-one degrees forty minutes north latitude, to realize that the geographical location of a river may be open to dispute, and, of course, the determination of the question must depend on parol evidence.

I have assumed that the act of 1888 is still in force. The act of March 20th, 1891, evinces no intention to repeal the act of 1888. It was evidently meant to apply only to such lands as were still within the control of the riparian commission, and to change the procedure for acquiring grants, not to extend the power of the commission to lands which only three years before had been withdrawn and which were the object

of the sedulous care of the legislature for the common benefit, as shown by the series of statutes above referred to.

The judgment should be reversed and a *venire de novo* awarded.

I am authorized to say that Justices Bergen and Minturn and Judges Bogert, Vroom, Gray, Dill and Congdon concur in these views.

MINTURN, J. Concurring in the views expressed by Mr. Justice Swayze, I am led to oppose this grant by the riparian commissioners upon the further ground that the only tenable view which its supporters advance to uphold it in a court of law against collateral attack is based upon the assumption that somewhere between the lines of the legislation affecting this commission there exists in view of the general power conferred to sell riparian lands, a power "tantamount to an adjudication" to determine whether or not the lands so conveyed are part of the natural oyster grounds of the state. But manifestly if it can be demonstrated that the power to make such an adjudication has been expressly vested by the legislature, not in the riparian commissioners, but in an entirely distinct, independent and co-ordinate commission, it must be perceived that the syllogism upon which such a claim is constructed is entirely fallacious.

In 1888 the legislature, for the protection of the great oyster industry of the state, and as a sequence to the consistent protective legislation which had its genesis in the year 1846 (Act for the protection of clams and oysters, approved April 14th, 1846), and which has been supplemented by legislation almost annually since, enacted that "No grant or lease of lands under tidewaters wherein there are natural oyster beds shall hereafter be made by the riparian commissioners of this state except for the purpose of building wharves, bulkheads and piers." *Pamph. L.* 1888, *p.* 140.

This act declared a legislative public policy relative to these lands, and was equivalent to a declaration, that a conveyance of the natural oyster beds of the state, excepting as indicated

in the excepting clause of the act, should be invalid, and *ipso facto* void.

It is significant that in no instance where the legislature has undertaken to deal with legislation enlarging or supplementing the powers of the riparian commissioners, do we find any intent, express or implied, that their duties shall extend to a determination tantamount to an adjudication, regarding the location of natural oyster beds; and it is a logical and legal inference that if the legislature intended to repose that power in these commissioners it would have so expressed itself. But *per contra* we find that in 1893, in an act entitled "An act to promote the propagation and growth of seed oysters, and to protect the natural oyster beds of this state" (*Pamph. L.* 1893, *p.* 503), oyster districts were created, beginning with District No. 1, and terminating with District No. 7, and that in one of the districts thus enumerated were included the lands in controversy. The first section of the act provides "that the natural oyster beds shall be and they are hereby divided into seven districts, as follows: District No. 3, from Gunning river south to Rose's Point; District No. 4, from Rose's Point south to the division line between Atlantic county and Ocean county." The second section of the act provides for the appointment of commissioners for the respective districts, who were required to take an oath for the faithful performance of their duties; which by the third section were prescribed *inter alia,* to be the supplying of shells upon these grounds, for the purchase of which the state appropriated annually $5,000. From this appropriation the act appropriated the sum of $500 "for the mouth of Mullica river and adjacent waters, known as graveling oyster beds."

The same act provides that "In the event that it may become necessary that any one particular district shall require a greater expenditure than above provided, the said commissioners, in meeting assembled, may determine the proportion to be allotted to such district."

In 1899, by an act under a similar title, the legislature divided these lands under water into six districts, denominating them all "The natural oyster seed grounds of this

state." *Section* 1. The centre line of Mullica river was made the division line between Districts Nos. 3 and 4, and three commissioners were appointed for the former districts and two for the latter. The act confers upon the commissioners powers substantially similar to those conferred by the act of 1893, and in its sixth section provides that "it shall be the duty of the said oyster commissioners to strictly enforce all existing laws regulating the natural oyster seed grounds of this state." And concludes by appropriating the sum of $12,000 *annually* to meet the requirements of the act.

This legislation, manifesting in every section the dominant purpose of the legislature to protect this great natural industry, contains within its provisions a specific designation of the *locus in quo* as natural oyster beds, and vests in the oyster commissioners the power and duty to protect the lands and regulate their use. If the power be not vested in these commissioners by this legislation to select and designate the natural oyster beds of the state, how can it be said, by mere constructive inference, that this power resides in a commission created and designated for a purpose entirely distinct from and foreign to such a duty?

Supplementing, in effect, the act of 1888, prohibiting sales of these lands as a declared public policy of the state, we thus have the distinct enumeration by the legislature and a description by natural boundaries of the natural oyster beds of the state, and the power is thereby vested in a distinct commission to perpetuate and protect the use of such lands. These acts, of course, are public acts and must be judicially noticed in any determination of this question, and it must also be presumed that the oyster commissioners did their duty, and expended under the requirements of this legislation in seeding the lands the large appropriation annually made for that purpose by the state. These lands were thus segregated by legislative fiat from the great body of riparian lands, and the protecting arm of the legislature was thrown about them.

The United States Supreme Court under similar conditions, in dealing with government grants by federal agencies of timber, mineral and swamp lands that had been "reserved

from sale," by acts of congress, has held "that a patent may be collaterally impeached *in any action,* and its operation and conveyance defeated by showing that the department had no jurisdiction to dispose of the lands; that the laws did not provide for selling them, or *that they had been reserved from sale or dedicated to special purposes." Wright* v. *Roseberry,* 121 *U. S.* 488; *Noble* v. *Union River Logging Co.,* 147 *Id.* 165; *Rice* v. *Minneapolis Northwestern Railway Co.,* 1 *Black* (*U. S.*) 358; *United States* v. *Stone,* 2 *Wall.* 525; *Polk* v. *Wendal,* 9 *Cranch* 87.

The record of this case shows that, upon the trial at the Circuit, Mr. Cole, the counsel for the state representing the attorney-general, made this offer: "We propose to show by this witness and by many others that the lands comprised within the grant from the riparian commissioners to the Sooys is natural oyster beds within the meaning of the amendment to the Riparian act of 1888," which testimony, upon objection by defendant's counsel, was excluded, and an exception was entered to the ruling. The court thereafter, without the introduction of further testimony, directed the jury to find for the defendant, upon the ground that the deed of the riparian commissioners could not be attacked collaterally, to which ruling also exception was taken. These exceptions present the questions here discussed, and upon both questions the rulings were erroneous for the reasons here advanced. Had the proffered testimony been allowed it might have been shown that for generations a hardy race of seafaring men had made an independent existence from these beds, and that the existence of the beds was as notorious as was the beacon light at Barnegat, of which no state board dealing with the subject-matter could plead ignorance. It might have been shown that for many years the state had expended thousands of dollars developing this great industry under the public policy indicated in this legislation, and these facts might have been established by the oyster commissioners as well as by the members of the vicinage. But it may be asked here how could the riparian commissioners, when making a conveyance, distinguish oyster lands from other lands under

tidal waters? The answer must be obvious. They as commissioners were supposed to know of the existence of the acts of the legislature upon this question. Side by side with them in legislative and legal contemplation was a co-ordinate commission constituted for the purpose of dealing with that very subject-matter, and entrusted, as these commissioners must have known, with the guardianship of this vast industry. Had they but knocked the door of this storehouse of information would have been opened to them. Had they but asked and confessed their ignorance they would have received the necessary information. But, in any event, neither their ignorance nor their negligence in the face of positive prohibitive legislation can breathe vitality into a grant of lands that had been both reserved from sale, and dedicated to special use by express legislative enactment. Nor can I acquiesce in the scholastic refinement and subtlety of distinction found necessary to differentiate the federal decisions in order to vindicate this grant, for the reason that, conceding the existence of this oyster legislation and its applicability to the case at bar, the question of construction cannot enter. The legislative intent in these acts is plain and leaves no room for construction, and in any case the rule is fundamental that he who seeks to maintain a claim in derogation of a public right can leave nothing to inference or conjecture. *Black Int. L.* 300; *Sewall* v. *Jones,* 91 *Pick.* 99; *Water Commissioners* v. *City of Hudson,* 2 *Beas.* 420; *Black* v. *Delaware and Raritan Canal Co.,* 9 *C. E. Gr.* 455.

But *argumentum ab inconvenienti* is invoked, and we are asked to support such grants upon a rule of constructive procedure which will accord them as is said: "Stability and value rather than that which will detract from, if not destroy such value by exposing them to constant collateral attack and invalidation by the verdict of juries of the vicinage." I am not of those who share disquieting fears regarding the results of the jury system; for with Blackstone it can be said that "it is a system of trial that hath been used time out of mind in this nation, and seems to have been coeval with the first civil government thereof." An institution, says De Lolme, that

is the "noblest invention for the support of justice ever produced." An institution, remarks Hume, "admirable in itself and the best calculated for the preservation of liberty and the administration of justice that ever was devised by the wit of man." Before the Twelve Tables of the Roman Law or the Pandects of Justinian were conceived, it found its genesis upon the banks of the Rhine and within the shadow of the round towers of Scotia Major, where the legions of the imperial Cæsars beheld it flourishing. *Tacitus Germanicus XII., Mooney's Gaelic Laws, &c.* Against it the conspiring forces of feudal despotism hurled themselves in vain. Against it was pitted through centuries of scholastic controversy a theocratic order which inherited the jurisprudence of classic Greece and Rome, combined with an aristocracy of class prejudice, which labored steadfastly for its downfall. It has withstood the ruthless hand of the invader and the bloody scenes of internecine strife. It has survived the destruction of dynasties, and the wreck and ruin of empires, and stands to-day unique and indestructible in the modern jurisprudence of the world, the sheet anchor of every nation, wherever popular government can claim an advocate, and the hope of every citizen, wherever humanity can command a champion.

It may well be asked, therefore, why such an institution, entrusted as has been this immemorially, not only with the disposition of the property and sacred honor of a people, but with their very lives, should be challenged in this day as a fit medium to determine conflicting claims in an action in ejectment—that their verdicts may vary must be expected where the facts are variant. That divers minds may vary upon a similar state of facts, is as demonstrable when applied to courts as when applied to jurors, as the decisions from the days of the year books will attest, except where the doctrine of *stare decisis* has compelled judicial consensus. But in any view of the jury system, as applied to civil procedure, the corrective power of the court in cases of passion, prejudice or unfair influence has invariably been extended to induce a result consistent with legal principles. And if an impartial jury of the vicinage cannot be procured, both common law

and statute provide for a change of venue. 1 *Tidd. Pr.* 654; *Practice Act,* § 203.

A misconception as to the function of a jury under this legislation, seems to prevail as a basis for the argument, for we find it urged that the *locus in quo* must revert to the state "whenever the allegation of a plaintiff in ejectment, that such land was a natural oyster bed obtained the concurrence of a jury of the locality." It is not the plaintiff's view, nor yet the jury's view, that under this legislation stamps the character of oyster lands upon the *locus in quo.* It is nothing less than the legislative fiat which existed at the execution of the grant, that such lands were and should remain inalienable that furnishes *ratio decidendi* for either—court or jury. This legislation, by metes and bounds, describes the lands; segregates them from the other lands of the state; and commands that they shall not be sold, but shall be denominated "natural oyster seed grounds of this state." *Pamph. L.* 1899, *p.* 160, § 1.

Under this legislation no claim could be supported for the existence of oyster lands in the Hudson, the Passaic or the Hackensack rivers, and the court would properly prevent speculation in the matter, by controlling the verdict because these streams are not within the language of the act. But where, as in the case at bar, the legislation designates "the mouth of the Mullica river and adjacent waters known as graveling oyster beds," as natural oyster beds, uncertainty vanishes, and the state was clearly entitled to the direction of a verdict upon the completion of the proffered proof.

But *argumentum ab inconvenienti* is further pursued, and it is urged that the state's revenue might be depleted; and that the revenue produced from sales of these lands is irrevocably applied to the support of free public schools. Logically considered, this contention might receive condemnation as a species of *petitio principii;* and legally it may be criticised as an argument of public policy for submission to the legislative branch of government, and therefore clearly *coram non judice* upon this argument. But it presents a misconception of the effect of the riparian legislation in this state.

The act of 1869 creating the riparian commission appropriated such income, first to the administrative purposes of the commission, then to the payment of the state debt, and finally to the trustees for the maintenance of free schools. *Pamph. L.* 1869, *p.* 1017. The act of 1871 devoted such receipts to the support of free schools. *Pamph. L.* 1871, *p.* 98. The act of 1890 devoted them to the necessary expenses of the state (*Pamph. L.* 1890, *p.* 92), and the act of 1894 finally appropriated them to the support of free public schools. If the maxim of construction, *contemporanea expositio est optima et fortissima in lege,* is to apply, we have here presented to us a legislative declaration antagonistic to the present contention. The only authoritative deliverance in support of this notion is an opinion of the late Attorney-General Grey, but neither his language nor any inference that can reasonably be derived from his language will support the contention. Of course, under the constitutional provision upon this subject, the revenue now in hand, whether derived from this or any other source, cannot be diverted to other uses; but there is no authority for the assumption that either the revenue *in futuro* or the riparian lands *eo nomine* are irrevocably pledged to the support of any department of the state government. Against the contention for a public policy, which is construed to require a sale of these lands for revenue, rests the accusation that in so doing the state is parting with the birthright of its people for a mess of pottage. Buckle, in his "History of Civilization in England," tells us that parliamentary agitation and legislation during fifty years prior to the time he wrote, was almost a continuous effort of the house of commons to regain and retrieve from class ownership not only the lost privileges of the people, but the lost highways, roads, greens and commons that form such a picturesque background to the history of early English rural life. And need we look beyond our own day in this land where the efforts of two administrations of the federal government have been directed to recovering lost forest, mineral and swamp lands, the common heritage of the nation? In the light of history it requires no exuberance of fancy to picture the dire

results to the state if the public policy inspired by this grant be adopted, as a result of which this great natural industry, the prolific toiling-place of generations of independent self-supporting citizens shall be aliened forever, and they themselves evicted as completely and as effectually, by the mere presence and potency of the great seal of the state, as were the thrifty Highland crofters of Scotland under the great "Sutherland clearances" at Lochaber, when a whole people were swept into exile, to make way for sheep walks and pasture lands. As against a so-called public policy, that would ignore the independent existence and self-supporting happiness of a people, and set it in the balance as *quid pro quo* for what Tennyson calls the "Jingling of the guinea," we may well invoke the condemnation of John Stuart Mill; "that when the inhabitants of a country quit it, because the government does not leave them room to live in it, that government is already judged and condemned." From whatever aspect, therefore, we may view this grant, it is defenceless in law and insupportable in policy.

The court being equally divided in opinion, the judgment under review must be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, REED, TRENCHARD, PARKER, VOORHEES, VREDENBURGH, JJ. 8.

*For reversal*—SWAYZE, BERGEN, MINTURN, BOGERT, VROOM, GRAY, DILL, CONGDON, JJ. 8.